COMMONWEALTH *vs.* RALPH F. VITELLO
(and eleven companion cases[1]).

Suffolk.   November 4, 1974. — April 1, 1975.

Present: TAURO, C.J., REARDON, QUIRICO, BRAUCHER, HENNESSEY, KAPLAN, & WILKINS, JJ.

*Search and Seizure. Practice, Criminal,* Warrant, Fair trial. *Evidence,* Telephone conversation, Spectrograph. *Eavesdropping. Disclosure of Communication. Statute,* Preemption. *Witness,* Expert witness. *Pleading, Criminal,* Indictment.

G. L. c. 272, § 99, as amended by St. 1968, c. 738, § 1, regulating wiretapping and eavesdropping, is in substantial compliance with Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U. S. C. §§ 2510-2520 (1970), and wiretap warrants issued in cases of defendants indicted for violations of Massachusetts gaming laws complied with both Federal and State statutory standards. [230-231]

Guidelines stated with respect to applications for wiretap warrants under G. L. c. 272, § 99. [231-233]

---

[1] Of the eleven companion cases one is against Ralph F. Vitello, one is against Henry Tanzi, two are against Camilla Villino, two are against Margaret M. Hogan, three are against Francis A. Vitello, and two are against Joseph Vitello.

Where wiretaps, and pen registers, were legally used on the telephones of defendants charged with violations of gaming laws and indicated probable cause for the issuance of search warrants, there was no error in the denial of motions to suppress physical evidence seized pursuant to search warrants issued in part on information derived from the wiretaps. [233-234]

Under *Commonwealth* v. *Lykus, ante,* 191 (1975), there was no error at a criminal trial in admitting in evidence the opinion of an expert based on spectrogram comparative analysis, commonly called voice print identification, that recorded voices of the defendants were the voices of unknown individuals previously recorded on tapes of telephone conversations intercepted pursuant to wiretap warrants. [233-234] KAPLAN, J., dissenting.

Where an expert testified at a criminal pre-trial voir dire hearing only in a theoretical way as to the reliability of voiceprint evidence and had no personal knowledge related to the issues and stated that he would be unavailable at the trial, there was no error in the denial of the defendants' requests for a continuance until the expert became available or for an order that he keep himself available. [234]

This court concluded by an "independent evaluation of the circumstances" of the trial of defendants convicted of violations of gaming laws that the jury stood indifferent and unaffected by almost a year of frequent and vigorous pre-trial newspaper publicity where the trial judge took strong measures to hold "a trial by an impartial jury free from outside influences," including detailed questions and instructions to prospective jurors collectively directed to the publicity issue, and the jurors seated were sequestered; there was no error in the judge's refusals to question each prospective juror individually, to put to the venire special questions, to direct the venire's attention to matters not part of the Commonwealth's case, or to continue the trial or transfer it to another place. [236-239]

Upon an indictment under G. L. c. 271, § 16A, charging that the defendant did "knowingly organize, supervise, manage and finance a number of people including . . . [five named persons] so that such persons might provide facilities and services . . . for the illegal registration of bets," and in the absence of any particulars filed by the Commonwealth, the judge correctly instructed the jury that if the defendant was "financing, organizing, supervising or managing a number of people, they don't necessarily have to be the people that are mentioned in this indictment, so long as there are four people." [239-240]

Conviction of a defendant upon an indictment under G. L. c. 271, § 16A, charging that he "did knowingly organize, supervise,

manage and finance a number of people" in an illegal gambling enterprise was warranted by the totality of the evidence, in part that sixty-six "writers" forwarded their "betting action" to three codefendants, that another codefendant was the "pick up" man and left the proceeds at the home of the defendant, and that in his home gaming apparatus, cash and financial records of the "operation as a whole" were found. [240-241]

This court concluded that the Federal wiretap statute, Title III of the Omnibus Crime Control and Safe Streets Act of 1968, examined in whole, meets the requirements of the Fourth Amendment to the United States Constitution [243-245]; that Congress intended to occupy the field of wiretapping and electronic surveillance, except as that statute specifically permits concurrent State regulation [245-246]; that to obtain a wiretap warrant from a State court there must be a State wiretap statute in effect [246-247]; and that, although a State may adopt standards more stringent than the requirements of Federal law, a State may not adopt standards which are less restrictive [247].

The Massachusetts wiretap statute, G. L. c. 272, § 99, as amended by St. 1968, c. 738, § 1, is severable, and, in the particulars challenged by defendants indicted for violations of gaming laws, was not repugnant to the provisions of the Federal wiretap statute, and was not preempted by it [249]; a pertinent concern was whether the Massachusetts statute conflicted with the Federal statute by failure to ensure the same or similar protections [249].

Under G. L. c. 272, § 99 F 1, the Attorney General, before authorizing an assistant attorney general "specially designated" by him to apply to a judge for a wiretap warrant, and a district attorney, before authorizing an assistant district attorney "specially designated" by him to apply for a wiretap warrant, must respectively review and authorize in writing the application presented; such procedures ensure the centralization, uniform enforcement policy, and public accountability deemed necessary by the Federal wiretap statute, and do not conflict therewith. [253-258]

The provisions of G. L. c. 272, § 99 I 2, authorizing a thirty-day period for a wiretap to begin upon the date of the installation of the intercepting device, conforms to the Federal wiretap statute. [258-259]

The provision of G. L. c. 272, § 99 E 3, that a wiretap warrant may issue only upon a showing by the applicant that normal investigative procedures have been tried and have failed or reasonably appear unlikely to succeed if tried satisfies the requirements of the Federal wiretap statute. [259]

The absence from G. L. c. 272, § 99, of the express requirement found in the Federal wiretap statute that the wiretap warrant

identify the person authorizing the application and the agency authorized to intercept does not invalidate the Massachusetts statute, since such requirement may be fairly implied therefrom. [260]

The requirement of 18 U. S. C. § 2518 (5) that "[e]very [wiretap] order and extension thereof shall contain a provision that the authorization to intercept shall be executed as soon as practicable" is fulfilled by the Massachusetts wiretap statute, taken as a whole [260-261]; the specific time sequence set forth in G. L. c. 272, § 99 F 2, ensures that a wiretap warrant, issued pursuant to a finding of probable cause, will be executed forthwith [261].

G. L. c. 272, § 99, is not invalid in that it has no express equivalent to the requirement in 18 U. S. C. § 2518 (5) that a wiretap order shall provide that an interception "be conducted in such a way as to minimize the interception of communications not otherwise subject to interception," since Massachusetts statutory procedures limit surveillance to conversations material to designated offenses under investigation and minimize intrusion on rights of privacy. [261-266]

G. L. c. 272, § 99, is defective in failing to provide that recordings of intercepted communications be kept for ten years, as required by the Federal wiretap statute; Massachusetts officials must henceforth keep all tapes and documents for ten years. [267]

The provisions of G. L. c. 272, § 99 M, that within seven days of the termination of a wiretap warrant a return must be made thereon to the issuing judge does not conflict with the prompt return provision in the Federal wiretap statute, and does not sanction a delay. [267]

G. L. c. 272, § 99 N, relating to the custody and secrecy of papers and recordings made pursuant to a wiretap warrant, meets the requirements of the Federal wiretap statute, provided that the Massachusetts statute is implemented by sealing the papers and recordings. [267-268]

Service of an attested copy of a wiretap warrant, pursuant to G. L. c. 272, § 99 L, on the person whose oral or wire communications have been intercepted provides him with adequate access to the information prescribed by 18 U.S.C. § 2518 (8) (d). [268]

Where the defendants were convicted of Massachusetts crimes clearly falling within offenses designated in the Federal wiretap statute, it was held that the defendants were without standing to claim that the Massachusetts wiretap statute on its face exceeds the scope of the Federal statute in that it allows for the use of electronic surveillance in crimes not designated in 18 U. S. C. § 2516 (2). [268]

Where a wiretap warrant stated its date of issuance and provided that the applicant could forthwith "tap and make connection with any and all wires leading to the telephone instrument as of this

Commonwealth v. Vitello.

date" and further provided "that such interception procedure be employed for a period not exceeding 15 days, . . . within the 30-days next following the date of the installation," it was held that the warrant stated the applicable limits for termination with sufficient clarity.  [270-271]

Where an application for a wiretap warrant contained an adequate statement of the termination date, and the supporting affidavit was sworn to by an officer involved in executing the warrant, but the termination date was omitted from the warrant through error and inadvertence, it was held that the warrant and the application could be read together, and that, so read, the warrant was properly limited in its duration.  [271-274]

Where the return on a wiretap warrant was made two days later than the time mandated by G. L. c. 272, § 99 M, it was held that the late filing of the return did not render inadmissible all evidence seized through the surveillance.  [275-276]

In the circumstances, the requirement of G. L. c. 272, § 99 M, that the return of a wiretap warrant contain a "statement of the premises or places where the interceptions were made" was satisfied, with respect to a wiretap warrant for 102 Cass Street, by the phrase "premises close by to the aforementioned 102 Cass Street." [276]

Where a wiretap warrant stated that "circumstances of exigency" required postponement of service of a copy of the warrant, and the issuing judge reviewed the criminal activity under investigation, in effect he determined that "important special facts" warranted such postponement, and the requirements of G. L. c. 272, § 99 L, were satisfied.  [276-277]

In a criminal case involving wiretapping, although the tapes were not sealed exactly in accordance with the statutory requirements, there was no error in admitting evidence derived from the wiretaps; sealing is a ministerial function and the defendants did not show any prejudice.  [277-278]

Where valid wiretap warrants were outstanding authorizing the use of "necessary and proper systems to (i)ntercept . . . [the] communications transmitted" from a certain telephone line, use of a pen register to record on tape the numbers dialed from that line was permissible without obtaining a separate order.  [278-279]

TWELVE INDICTMENTS found and returned in the Superior Court, eleven on June 2, 1972, and one on June 21, 1972.

Pre-trial motions to suppress evidence were heard by *Roy, J.,* and the cases were tried before him.

After review was sought in the Appeals Court, the Supreme Judicial Court, on its own initiative, ordered direct appellate review.

*Francis J. DiMento (Thomas C. Cameron* with him) for the defendants.

*John T. Gaffney,* Assistant District Attorney & *Thomas E. Dwyer,* Special Assistant District Attorney, for the Commonwealth.

HENNESSEY, J.  The defendants were convicted after a jury trial on indictments charging them with violations of various gaming laws.[2]  They assign and argue as error: (1) the denial of their motions to suppress the contents of intercepted wire and oral communications, (2) the denial of their motions to suppress certain physical evidence which was seized on warrants based in part on information derived from the wiretaps, (3) the admission in evidence of expert testimony which purported to identify the defendants' recorded voices through spectrographic comparisons, (4) the holding of a pre-trial voir dire hearing on the scientific reliability of voice identification by means of the voiceprint technique, where the expert witness stated that he would not be available to testify before the jury at the trial, and where the judge had no intention of keeping the witness available for the trial, (5) the denial of various motions of the defendants concerning the pre-trial publicity related to the cases, and (6) the rulings of the judge relating to the indictment of Francis A. Vitello charging him with organizing a gambling syndicate, including the trial judge's refusal to give the jury instructions as requested by the defendant with respect to this indictment.

---

[2] G. L. c. 271, § 7 (being concerned with setting up and promoting an illegal lottery for money).  G. L. c. 271, § 17 (being found with apparatus for the purpose of registering bets).  G. L. c. 271, § 17A (using a telephone for the purpose of accepting wagers and registering bets).  G. L. c. 271, § 16A (knowingly organizing, supervising, managing, and financing at least four persons so they might provide facilities and services for conducting illegal lotteries).

We have determined that there was no error and, for the reasons stated in this opinion, we affirm the judgments.

1. The defendants in these cases raise a substantial number of issues with respect to the validity of the wiretap warrants pursuant to which certain inculpatory communications were intercepted and offered in evidence against them. They challenge both the facial validity of the Massachusetts wiretap statute, G. L. c. 272, § 99, and the facial validity of the warrants issued thereunder. However, the defendants do not seek to challenge the constitutionality of the Federal or State statutes under the Fourth Amendment to the United States Constitution.[3] Rather, the bases of their claims are that the State statute must conform in all respects to the comprehensive Federal legislation on eavesdropping, Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U. S. C. §§ 2510-2520 (1970), 82 Stat. 211 (1968) (hereinafter referred to as Title III); that G. L. c. 272, § 99, does not so conform; and that, even assuming such compliance as a statutory matter, the warrants do not meet the Federal and State requirements. We hold, contrary to the defendants' contentions, that the State statute is in substantial compliance with the Federal law and also that the warrants comply with both Federal and State statutory standards. Because of the multiplicity of the defendants' claims, because of the relationships of many of the statutory issues to Fourth Amendment

---

[3] Although the issue is assigned as error, the defendants do not argue that the warrants in these cases were invalid under the Fourth Amendment. In other words, they apparently do not now contest that the applications, based on a long and detailed police investigation, requesting the orders authorizing the wiretaps, demonstrated the existence of probable cause. Neither do they contend that the orders themselves failed to meet the particular requirements of the Fourth Amendment, as opposed to Title III, nor that the intercepted conversations sought to be offered in evidence were not among those authorized to be intercepted.

values, and because these cases present the first full review of the State wiretapping statute, we are required to engage in an extensive analysis of the wiretapping legislation. Due to the length of this analysis and for purposes of organization, our examination of both the relevant statutory provisions and the wiretap warrants issued in these cases is included as an Appendix herewith. *However, the legal holdings and our reasoning underlying these holdings, as expressed in the Appendix, are to be considered as incorporated herein and made a part of the substance of this opinion.*

Although we have concluded that the wiretap warrants issued in these cases comply with constitutional and statutory requirements both Federal and State, we deem it advisable to set forth in brief outline, guidelines which we hope will forestall difficulties similar to those encountered in these cases and will be of assistance in future cases both to this State's prosecuting attorneys authorized to apply for wiretap warrants and to the Superior Court judges required to review such applications and issue warrants. See § 99 B 9 wherein "judge[s] of competent jurisdiction" is defined to mean "any justice of the superior court."

At the outset, we point out that the provisions of the relevant wiretap statutes are designed to ensure that unjustified and overly broad intrusions on rights of privacy are avoided. Hence these provisions are not mere technical niceties and distinctions of form. In short, the statutes, while permitting wiretapping for law enforcement, seek to ensure that Fourth Amendment rights are not infringed. While perfection in drafting affidavits, applications, and other documents is not realistically demandable, careful attention to the statutory directives is required and these emendations are offered to further that effort.

First, with respect to special designation of assistant attorneys general and assistant district attorneys (§ 99 F 1), the Attorney General or the district attorney, as the

case may be, should give full and fair review of the grounds asserted for seeking a wiretap warrant. Special designation to the assistant attorneys general and assistant district attorneys must be on a case by case basis only. Authority to apply for each wiretap warrant must be specifically granted in writing by the Attorney General or the district attorney as the case may be. Indeed, it can be said that the better procedure is that the Attorney General or district attorney should cosign the application for the warrant with the designated assistant, although the Attorney General or district attorney need not himself appear before the judge. See Appendix part F (1), particularly fn. 17.

Second, an application for a wiretap warrant in addition to being drafted in accordance with the provisions of G. L. c. 272, § 99 F, should, if practicable, give an estimate as to the time required for the installation of intercepting devices in order that the reviewing judge may determine whether the thirty-day period, § 99 I 2, would be impermissibly extended. See Appendix part F (2). Where installation of devices is required, such installation is to be effected with all reasonable speed. See Appendix part F (2) and (5). In all cases execution of a warrant shall be forthwith and the warrant should so direct. In addition both the application and any supporting affidavits should affirmatively demonstrate knowledge of the requirement that interception be limited to matter material to the designated crimes under investigation and an intent so to limit the interception in order that the intrusion be sufficiently limited. (This does not mean that inculpatory information relating to other nonrelated crimes shall be ignored.) Specific instructions relative to limiting the interception should be given to the executing officers. See Appendix part F (6).

Third, pursuant to § 99 I 2, the date of issuance, the date of effect, and the termination date shall be stated clearly on the face of the warrant. Where physical

installation of intercepting devices is required the date of effect could be stated approximately based on an estimate of the reasonable time required for installation procedures.

Fourth, in light of our construction of G. L. c. 272, § 99, each warrant shall identify the person authorizing the application and the agency authorized to intercept. See Appendix part F (4). As directed above, that agency shall execute the warrant forthwith. See Appendix part F (5).

Fifth, in accordance with the provisions of § 99 M, the return is to be made to the issuing judge as soon as possible following the termination of the interception and at the latest within seven days thereafter. After examining the return, including the condition of the original recordings, which shall be a part of the return, the issuing judge shall seal the recordings and transmit them forthwith to the Chief Justice of the Superior Court. § 99 N. In order to comply with the Federal requirements set forth in 18 U. S. C. § 2518 (8) (a) (b) (1970), the recordings, as well as the application, warrant, renewal where applicable, and the return shall be kept for ten years. See Appendix part F (7).

2. The next assignment of error argued by the defendants relates to the denial of motions to suppress certain physical evidence which was seized pursuant to warrants issued in part on the basis of information derived from the wiretaps. Since we have concluded that the wiretaps were legal and that there was no error in the judge's refusal to suppress the contents of the intercepted telephone communications, it follows that there was no error in his further denial of the motions to suppress the physical evidence. As the defendants concede, if the wiretaps and use of the pen registers were proper, probable cause existed for the issuance of the search warrants and we so hold.

3. Certain opinions of an expert witness, Lt. Ernest W. Nash of the Michigan State police, were admitted in

evidence over the objections and exceptions of the defend-
ants. Lieutenant Nash testified as to the results of his
comparison of the known voices of the defendants with
the voices of unknown individuals recorded on the tapes
of intercepted telephone conversations. The method used
for such analysis is termed spectrogram comparison
analysis, or, more commonly, voiceprint identification.
Lieutenant Nash testified that the voices of the six
defendants were, in his opinion, positively the voices of
certain unknown individuals whose voices were recorded
pursuant to the wiretap warrants.

The defendants do not argue that Lt. Nash was not
sufficiently qualified as an expert in spectrogram com-
parison analysis. Rather, they contend that this type of
voice identification is a new scientific theory and that its
admission should have been precluded under the rule of
*Commonwealth* v. *Fatalo,* 346 Mass. 266, 269 (1963),
which provides that judicial acceptance of a scientific
theory or instrument can occur only where it follows a
general acceptance by the community of scientists
involved. See *Frye* v. *United States,* 293 Fed. 1013
(D. C. Cir. 1923). There was no error. The opinions of
Lt. Nash were properly received in evidence, under
reasoning as shown in our opinion in *Commonwealth* v.
*Lykus, ante,* 191 (1975).

4. On March 22 and 23, 1973, about two weeks prior
to trial, the judge held a voir dire hearing to make pre-
liminary rulings as to reliability and admissibility of
opinion testimony as to voice identification by the voice-
print method. Dr. Oscar Tosi testified in detail at the
hearing, which culminated in rulings by the judge that
ultimately resulted in admission at the trial of the
evidence related to voiceprints.

Dr. Tosi made clear during the hearing that he would
be in Italy during the time of the jury trial of these
indictments. Aware of this fact, the judge nevertheless
declined to continue the trial, on motions of the defend-
ants, until such time as Dr. Tosi would be available.

Nor did the judge accede to the defendants' request that Dr. Tosi be ordered to keep himself available. The defense served at least one summons on Dr. Tosi but it is clear that he did not respond to it and that the judge would not enforce it. The judge's rulings on the voice-print issues were undoubtedly due in large measure to Dr. Tosi's testimony at the pre-trial hearing.

The defendants argue, inter alia, that their Sixth Amendment rights under the United States Constitution to present witnesses in their own defense were violated in this failure by the judge to ensure the presence of Dr. Tosi at the jury trial. They cite *Washington* v. *Texas*, 388 U. S. 14, 19 (1967), wherein the Supreme Court ruled that the right of a defendant to present witnesses to establish a defense is "a fundamental element of due process of law." The defendants also rely on similar language in *Chambers* v. *Mississippi*, 410 U. S. 284, 294-295 (1973), and *White* v. *State*, 517 S. W. 2d 543 (Tex. Crim. App. 1974).

There was no error. Unlike the witnesses in the cases relied on by the defendants, Dr. Tosi had no personal knowledge related to the issues before the jury, as distinguished from his expert knowledge related only to the admissibility issues which were solely for the judge. As far as appears, Dr. Tosi had nothing to do with the identification comparisons related to these cases. In this sense, he testified at the pre-trial hearing only in a theoretical way as to the reliability of this type of evidence.

It is true that the weight to be given to the voice-print evidence was relevant at the trial, and Dr. Tosi might well have testified on that score. Nevertheless, in similar circumstances, we have ruled that a party may not by summons compel the involuntary testimony of an expert witness solely for the expertise he may bring to the trial, and in the absence of any personal knowledge on his part related to the issues before the judge and the jury. *Ramacorti* v. *Boston Redevelopment Authy.*

341 Mass. 377, 379-380 (1960).  *Fifty-Five Mkt. St. Inc.*
v. *Lynn Redevelopment Authy.* 354 Mass. 758 (1968).

5. There was no error in the judge's rulings related to
newspaper publicity. The defendants have shown that
they were arrested almost one year before the trial and
that newspaper publicity related to them and their
alleged offenses was frequent and vigorous during this
period, up to and including the two days of the
empanelling of the jury.  Further, the publicity related
to alleged "payoffs to police officers," which were not the
subject of the indictments.

The defendants assert that they were entitled to
continuance of the trial date and to questioning of each
prospective juror according to specific wording submitted
by the defendants.  The judge took none of these precise
steps, but we believe that he took measures which
protected the rights of the defendants to "a trial by an
impartial jury free from outside influences." *Sheppard* v.
*Maxwell,* 384 U. S. 333, 362 (1966).  Cf. *Common-
wealth* v. *Geagan,* 339 Mass. 487 (1959), cert. den. 361
U. S. 895 (1959).  Our "independent evaluation of the
circumstances," as required of appellate courts by the
*Sheppard* case, shows that the judge took "strong
measures to ensure that the balance . . . [was not]
weighed against the accused."  384 U. S. at 362 (1966).

The judge addressed the venire of prospective jurors, as
well as a supplementary group of prospective jurors who
were later assembled, in detailed language directed to the
publicity issue.  He thus described to all prospective
jurors, before empanelling, the exact nature of the
charges against the defendants, using such plain terms as
"gambling" and "bookmaking."  The full names of all
the defendants were emphasized.  He placed on the
veniremen, and each of them, the duty to make it known
to the judge if they were influenced by bias or if they
had read or heard of the defendants and the cases at
issue.  He described in appropriate language, and at
length, the duty of impartiality imposed on jurors.

Later, when prospective jurors were seated in the jury box, he put to them as a group a series of eleven questions which in various and appropriate words probed the issue of impartiality. One question (no. 11) inquired: "Have you read, heard on the radio, or seen on TV any publicity concerning this case?" and he concluded the questioning with the direction: "If any of the these questions affect any of the jurors, they are now to stand." No juror responded to this direction.

Finally, by order of the judge, the jury were sequestered for the duration of the trial.

The judge was not required in these circumstances to question each prospective juror individually. To the extent that *Patriarca* v. *United States*, 402 F. 2d 314 (1st Cir. 1968), cert. den. 393 U. S. 1022 (1969), suggests that each prospective juror should be examined individually with a view to eliciting the kind and degree of his possible exposure to pre-trial publicity that case is not relevant here. In the instant cases the trial judge determined, and rightfully so, that the jurors stood indifferent. Given the nature of the pre-trial publicity, relating in major part to police "payoff" lists, the judge could have properly decided after addressing the jurors on the publicity issue that no further individual inquiry was necessary.

Moreover, the trial judge was not required to put various special questions proposed to him by defense counsel. In particular he was not required, as urged by one attorney, to bring to the attention of the venire alleged police "payoffs" which were not part of the Commonwealth's case. Nor was he, in view of the jury response (or lack of response) to his directions and questions, required to continue the trial or transfer it to another place. The defense counsel, at the trial and later in their brief, expressed incredulity that the jurors had not read or heard about the defendants and their indictments. This perhaps reflects no more than that counsel

were more sensitive to the attentions of the press to these matters than were persons not so directly concerned.

The assertions of the defense as to pre-trial publicity required serious measures by the judge in the interest of ensuring a fair trial before an impartial jury. The judge's responsive measures were appropriate and in accord with the relevant requirements of *Commonwealth v. Subilosky*, 352 Mass. 153, 158 (1967). See A. B. A. Standards Relating to Fair Trial and Free Press, § 3.4 (1968).

In light of our conclusion that the jury stood indifferent and unaffected by the pre-trial publicity, it is not necessary for us to consider the defendants' further claims related to the judge's refusal to order a certain newspaper reporter to disclose his sources for certain newspaper accounts of an alleged police "payoffs" list. Cf. *Matter of Pappas*, 358 Mass. 604, 612 (1971), affd. sub nom. *Branzburg* v. *Hayes*, 408 U. S. 665, 672 (1972).[4] Assuming that, as the defendants assert, a "much higher standard prevails" where pre-trial publicity is accomplished by design of the prosecutor (*Henslee* v. *United States*, 246 F. 2d 190, 193 [5th Cir. 1957]), no prejudice has been demonstrated here where the jury were shown, by specific measures, to stand indifferent. Nor is there anything before us, other than the bald assertion by defense counsel, to show that the reporter's

---

[4] In view of our conclusion that the defendants' constitutional rights were not prejudiced or adversely affected by pre-trial publicity, we need not consider whether the harmless error standard should be applied to dispose of the defendants' contentions. The basis for applying the harmless error rule would be that the evidence of guilt in these cases was so overwhelming that if constitutional error had been shown in this regard, the evidence for conviction would nevertheless have been sufficient to reach even the higher degree of beyond a reasonable doubt. See *United States* v. *Barnes*, 383 F. 2d 287, 295 (6th Cir. 1967), cert. den. 389 U. S. 1040 (1968); *United States* v. *Cimini*, 427 F. 2d 129, 130 (6th Cir. 1970), cert. den. 400 U. S. 911 (1970).

source might have been related to the pending investigation of these cases by the office of the district attorney.

6. The defendant Francis A. Vitello contends that the judge erred in refusing to instruct the jury, as requested by the defendant, that the Commonwealth must show, as to proof of the indictment brought under G. L. c. 271, § 16A, that the defendant organized a gambling syndicate specifically including four of the five persons named in the indictment. There was no error.

General Laws c. 271, § 16A, inserted by St. 1970, c. 650, provides in part as follows: "Whoever knowingly organizes, supervises, manages or finances at least four persons so that such persons may provide facilities or services or assist in the provision of facilities or services for the conduct of illegal lotteries, or for the illegal registration of bets . . . shall be punished. . . ."

The related indictment charged that Francis A. Vitello: "[D]id knowingly organize, supervise, manage and finance a number of people including Margaret M. Hogan, Camilla Villino, Henry Tanzi, Ralph F. Vitello and Joseph Vitello, so that such persons might provide facilities and services for the conduct of illegal lotteries and for the illegal registration of bets."

The defendant Francis A. Vitello seasonably requested instructions which would have required (1) a finding by the jury that he "organized, supervised, managed or financed at least four of the five persons named in the indictment," and (2) that the jury consider in their enumeration only the persons named in the indictment.

The judge declined to give the requested instructions and instead instructed: "[I]f you find that he was financing, organizing, supervising or managing a number of people, they don't necessarily have to be the people that are mentioned in this indictment, so long as there are four people." This was correct. There was evidence that some sixty-six persons were working in Francis Vitello's organization. From the plain language of the statute, § 16A, the naming of five persons was no more

than surplusage, in light of the language in the indictment relating this defendant to "a number of people" *including* the five named persons. See G. L. c. 277, §§ 34-35; *Commonwealth* v. *Beneficial Fin. Co.* 360 Mass. 188, 309-310 (1971), cert. den. sub nom. *Farrell* v. *Massachusetts*, 407 U. S. 910 (1972), and sub nom. *Beneficial Fin. Co.* v. *Massachusetts*, 407 U. S. 914 (1972). This defendant's reliance on *Commonwealth* v. *Hartwell*, 128 Mass. 415 (1880), is misplaced, since that case concerned the prosecution's failure to show certain conduct of the defendant which was particularly described in the indictment and on which the Commonwealth relied to support its allegation of wanton and reckless conduct. Also misplaced is this defendant's reliance on several cases concerned with particulars filed by the Commonwealth by order of the court, viz.: *Commonwealth* v. *Giles*, 1 Gray 466 (1854), *Commonwealth* v. *Hayes*, 311 Mass. 21, 24-25 (1942), *Commonwealth* v. *Ries*, 337 Mass. 565, 580-581 (1958), and *Commonwealth* v. *Iannello*, 344 Mass. 723, 726 (1962). The filing of particulars in the circumstances of those cases placed a special burden of specificity in proof on the Commonwealth. No particulars were filed as to the indictments presently before us.

7. In addition, the defendant Francis A. Vitello asserts error in the denial of his motion for a directed verdict of not guilty as to the indictment which charged, under the provisions of G. L. c. 271, § 16A, that he "did knowingly organize, supervise, manage and finance a number of people" in an illegal gambling enterprise.[5] He argues that the evidence was insufficient to warrant a guilty verdict.

---

[5] The defendants make no claim that they, or any of them, were entitled to directed verdicts on any of the other indictments, except the defendants Camilla Villino and Margaret M. Hogan who contend that, but for the voiceprint evidence, they would have been entitled to directed verdicts of not guilty.

The totality of the evidence was sufficient, as judged in the light most favorable to the Commonwealth, to permit a conclusion of guilt. *Commonwealth v. Medeiros,* 354 Mass. 193, 197 (1968), cert. den. sub nom. *Bernier v. Massachusetts,* 393 U. S. 1058 (1969). *Commonwealth v. Lussier,* 364 Mass. 414 (1973). Cf. *Commonwealth v. O'Brien,* 305 Mass. 393, 401 (1940). We decline to follow the approach of this defendant, with its emphasis, as we view the argument, that bits and fractions of the evidence, when examined in isolation, were equivocal at best.

The evidence which adequately supported the submission of indictment no. 66772 to the jury was, at least in part, as follows: sixty-six "writers" were forwarding their "betting action" to the defendants Margaret Hogan, Camilla Villino, and Ralph Vitello; the defendant Tanzi was the "pick-up" man for the organization; while under surveillance, Tanzi appeared to make his pickups and leave the proceeds at the home of Francis A. Vitello; in the room in the home of Francis A. Vitello where considerable gaming apparatus was found at the time of his arrest, there was also found the sum of $98,560 in cash; financial records of the "operation as a whole" were also seized by police in the home of Francis A. Vitello; from many of the recorded telephone conversations, it could be inferred that "Frank" was the organizer, supervisor, manager, and financier of the organization, and from the total evidence it could also be inferred that "Frank" was Francis A. Vitello.

*Judgments affirmed.*

Commonwealth v. Vitello.

APPENDIX

As stated in part 1 of the foregoing opinion, the following detailed analysis of the constitutional and statutory issues concerning the wiretaps *is incorporated by reference in the opinion and is to be deemed an expression of our holdings in these cases.*

A.   *The Fourth Amendment.*
Since the advent of modern electronic technology, the means to eavesdrop by interception of wire and oral communications has existed.   Whether and to what extent utilization of such procedures by law enforcement officials violates Fourth Amendment sanctions against unreasonable searches and seizures has been considered by the United States Supreme Court.   Since the statutory schemes, both Federal and State, that are the subject of these cases were enacted in part to meet the constitutional requirements as construed in the United States Supreme Court cases, a short review of the Fourth Amendment as applied in the area of electronic wiretapping is appropriate.
In *Olmstead* v. *United States*, 277 U. S. 438 (1928), the Supreme Court held that wiretapping did not constitute a search within the meaning of the Fourth Amendment.   Cf. *Goldman* v. *United States*, 316 U. S. 129 (1942); *Silverman* v. *United States*, 365 U. S. 505 (1961). However, in *Berger* v. *New York*, 388 U. S. 41 (1967), and *Katz* v. *United States*, 389 U. S. 347, 353 (1967), the court reconsidered the "physical intrusion" doctrine that had been articulated in the earlier eavesdropping cases and concluded that, in the light of subsequent Fourth Amendment decisions, that doctrine should be abandoned.   Further, the court concluded that the proper inquiry was whether the individual subject to the search and seizure had a reasonable expectation of privacy in the area searched since the Fourth Amendment "protects

people — and not simply 'areas' — against unreasonable searches and seizures." 389 U. S. at 353 (1967).

In the *Berger* case, a New York statute, which authorized eavesdropping for periods up to sixty days on the basis of a sworn statement and allowed an unlimited number of extensions "in the public interest," was held unconstitutional as authorizing "general searches by electronic devices." 388 U. S. at 58, 59 (1967). However, the court indicated that wiretapping might be constitutionally permissible if conducted under rigid Fourth Amendment controls,[1] that is "under the most precise and discriminate circumstances, circumstances which fully met the 'requirement of particularity'" of the Fourth Amendment. *Osborn* v. *United States*, 385 U. S. 323, 329 (1966).

B. *The Constitutionality of Title III.*

Title III is in part the congressional response to the Supreme Court decisions and seeks to remedy those constitutional defects which resulted in the invalidation of the wiretap statute in the *Berger* case. The act prohibits all interception of oral and wire communications except as provided for specifically.[2] As stated in the legislative

---

[1] For a comprehensive bibliography of the commentary on electronic surveillance see A. B. A. Standards Relating to Electronic Surveillance, Appendix E, 237-250 (Tent. draft 1968).

[2] Under Title III, a wiretap order must be preceded by an application to be submitted to a judge of competent jurisdiction by specifically designated officials. The application must contain prescribed information establishing probable cause to believe a designated offense is being committed and must establish the need for surveillance by wiretap (§ 2518 [1]). A judge before issuing an order is required to make specific findings (§ 2518 [3]) including whether probable cause exists and the order itself must contain provisions which particularize the extent and nature of the interception permitted (§ 2518 [4]). The order is to expire in a specific time and in any event may not last longer than thirty days (§ 2518 [5]). The judge issuing the order may maintain continuing judicial supervision over the interception (§ 2518 [6]). The act contains a notice and

history,[3] Title III has as its purpose (1) protecting the privacy of wire and oral communications and (2) delineating on a uniform basis the circumstances and conditions under which the interception of oral and wire communications may be permitted. Sen. Rep. at 2153. Accordingly, Title III seeks to provide the judicial supervision and procedures found lacking in *Berger* v. *New York*, 388 U. S. 41 (1967).

The defendants do not argue that Congress has failed in that regard and they do not challenge per se the constitutionality of Title III on its face. However, since the entire wiretap system as presently constituted, Federal and State, depends ab initio on the constitutionality of Title III,[4] we note that the act, taken as a whole, does ensure appropriate particularity in the application and order and further provides the necessary and proper judicial supervision and other protective controls to preserve Fourth Amendment interests. In so stating we concur with the many Federal Courts which have examined Title III.[5] Since it would be superfluous for us

inventory provision (§ 2518 [8]), as well as a provision for the custody of any recordings produced (§ 2518 [8]). Also included is a provision specifying the circumstances and procedures pursuant to which an aggrieved person may seek an order for the suppression of intercepted wire or oral communications sought to be used in evidence by the government (§ 2518 [10] [a]).

[3] Senate Report on the Omnibus Crime Control and Safe Streets Act of 1968 (Judiciary Committee), Sen. Rep. No. 1097, 90th Cong., 2d Sess., U. S. Code Cong. & Adm. News 1968, 2112-2309 (hereinafter cited as Sen. Rep. with appropriate pagination to the U. S. Code Cong. & Adm. News).

[4] We express no opinion as to whether a wiretap order would be valid absent the existence of Title III.

[5] Federal Courts of Appeals in nine circuits have considered the statute and held that it meets the requirements of the Fourth Amendment. *United States* v. *Cox*, 449 F. 2d 679 (10th Cir. 1971), cert. den. 406 U. S. 934 (1972). *United States* v. *Cox*, 462 F. 2d 1293 (8th Cir. 1972), cert. den. 417 U. S. 918 (1974). *United States* v. *Cafero*, 473 F. 2d 489 (3d Cir. 1973), cert. den. 417 U. S. 918

to restate the reasoning of those cases in upholding the constitutionality of Title III, and since the defendants make no attack in this regard, we engage in no extensive analysis on this question but simply state our agreement with the courts which have held that Title III, examined in whole, meets the requirements of the Fourth Amendment.

C. *State Regulation of Wiretapping.*

Conceding the constitutionality of Title III, the defendants attack the Massachusetts statute, pursuant to which the wiretap warrants at issue here were obtained.[6] They argue, inter alia, that the State statute fails to meet the enabling requirements for State legislation. More precisely stated, the issue involves Federal preemption and the degree to which a State statute must track in haec verba the provisions of the Federal wiretap statute. In order to analyze fully the defendants' claims, a brief description of the interrelationships between the Federal and State legislation is necessary.

It is clear that Congress in enacting Title III intended to occupy the field of wiretapping and electronic surveillance, except as that statute specifically permits concurrent State regulation. In addition to express statements appearing in the congressional findings in Title III,[7] that intent may be gleaned from the broad scope of

---

(1974). *United States* v. *Bobo,* 477 F. 2d 974 (4th Cir. 1973). *United States* v. *Tortorello,* 480 F. 2d 764 (2d Cir. 1973), cert. den. 414 U. S. 866 (1973). *United States* v. *James,* 494 F. 2d 1007 (D. C. Cir. 1974), cert. den. sub nom. *Tantillo* v. *United States,* 419 U. S. 1020 (1974). *United States* v. *O'Neill,* 497 F. 2d 1020 (6th Cir. 1974). *United States* v. *DeCesaro,* 502 F. 2d 604 (7th Cir. 1974). *United States* v. *Ramsey,* 503 F. 2d 524 (7th Cir. 1974). *United States* v. *Chun,* 503 F. 2d 533 (9th Cir. 1974).

[6] The defendants also attack the warrants for failure to meet Federal and State standards. This aspect of their challenge is discussed in part G, *infra.*

[7] See § 801 of Title III which contains the congressional findings.

particular provisions of Title III. Although the legislative history of Title III evinces a congressional concern for national legislation, Congress, having preempted the field, did in turn allow for concurrent State regulation subject, at the minimum, to the requirements of the Federal regulation. See § 2516 (2).[8] See generally, *People* v. *Conklin,* 12 Cal. 3d 259 (1974), app. dism. sub nom. *Conklin* v. *California,* 419 U. S. 1064 (1974).

Pursuant to § 2516 (2) a State may promulgate legislation authorizing certain designated officials to apply to State court judges of competent jurisdiction for wiretap orders to be utilized in enforcement of statutes designated under the State criminal law. However, the Federal act *is not self-executing in so far as the State authorities are concerned;* in order to obtain a wiretap warrant from a State court, there must be a State

---

In addition, the Senate Report on particular provisions on Title III specifically indicates areas in which the Congress did not intend to preempt State legislation. See, e.g., § 2511 (knowledge required to violate); § 2512 (ban on manufacture, distribution, possession, and advertisement of interception devices); § 2520 (recovery of civil damages).

[8] Section 2516 (2) specifically provides for such State regulation: "The principal prosecuting attorney of any State, or the principal prosecuting attorney of any political subdivision thereof, if such attorney is authorized by a statute of that State to make application to a State court judge of competent jurisdiction for an order authorizing or approving the interception of wire or oral communications, may apply to such judge for, and such judge may grant in conformity with section 2518 of this chapter and with the applicable State statute an order authorizing, or approving the interception of wire or oral communications by investigative or law enforcement officers having responsibility for the investigation of the offense as to which the application is made, when such interception may provide or has provided evidence of the commission of the offense of murder, kidnapping, gambling, robbery, bribery, extortion, or dealing in narcotic drugs, marihuana or other dangerous drugs, or other crime dangerous to life, limb, or property, and punishable by imprisonment for more than one year, designated in any applicable State statute authorizing such interception, or any conspiracy to commit any of the foregoing offenses."

wiretap statute in effect.[9] *State* v. *Siegel,* 266 Md. 256 (1972). *Halpin* v. *Superior Court of San Bernardino County,* 6 Cal. 3d 885 (1972), cert. den. sub nom. *California* v. *Halpin,* 409 U. S. 982 (1972). Most importantly, although a State statute may adopt standards more stringent than the requirements of Federal law, thus excluding from State courts evidence that would be admissible in Federal courts, a State may not adopt standards that are less restrictive than those set forth in Title III.[10] *People* v. *Jones,* 30 Cal. App. 3d 852 (1973), app. dism. sub nom. *California* v. *Jones,* 414 U. S. 804 (1973). *State* v. *Siegel, supra.* Because of this, any evidence obtained under a State statute less restrictive than Title III would be inadmissible in State courts. § 2515.[11]

---

[9] The Senate Report in § 2516 (2), at p. 2187, states, "No applications may be authorized unless a specific State statute permits it."

[10] With respect to the standards for State wiretap statutes promulgated pursuant to § 2516 (2) the Senate Report at 2187 provides: "The State statute must meet the minimum standards reflected as a whole in the proposed chapter. The proposed provision envisions that States would be free to adopt more restrictive legislation, or no legislation at all, but not less restrictive legislation. State legislation enacted in conformity with this chapter should specifically designate the principal prosecuting attorneys empowered to authorize interceptions. The State judge of competent jurisdiction . . . empowered by the State legislation to grant orders for interceptions would have to make findings which would be the substantial equivalent to those required by section 2518 (3) . . . and the authorization itself would have to be made in substantial conformity with the standards set out in section 2518."

[11] Exclusion would result since § 2515 provides: "Whenever any wire or oral communication has been intercepted, no part of the contents of such communication and *no evidence derived therefrom may be received in evidence in any trial, hearing, or other proceeding in or before any court,* grand jury, department, officer, agency, regulatory body, legislative committee, or other authority of the United States, *a State, or a political subdivision thereof if the disclosure of that information would be in violation of this chapter"* (emphasis supplied). See § 2516 (2) wherein it is provided in pertinent part that the State order is to be granted "in conformity with section 2518 of this chapter *and* with the applicable State statute" (emphasis supplied).

D.  *Limited Requirements for State Statute.*

We point out, however, that the preemption analysis as it relates to the validity of the State statute itself should be distinguished from the issue of the validity of a warrant issued pursuant to a State statute found in certain particulars to be in conflict with Title III and therefore partially preempted.  The two questions are not entirely dependent.[12]  It does not follow that if the State statute is found repugnant to Title III in certain particulars all warrants issued thereunder are as matter of course invalid.

This construction of Title III is based on the language of § 2516 (2).  That section provides that a State's principal prosecuting attorneys "*if such . . . [attorneys are] authorized by a statute of that State* to make application to a State court judge of competent jurisdiction [may apply] for an order authorizing or approving the interception of wire or oral communications" (emphasis supplied).  Thus the crucial issue is whether there is a State statute in effect which authorizes such application. It would be possible for the State statute to consist of one short section simply setting forth the specially designated State prosecuting attorneys authorized to apply, and the State court of competent jurisdiction wherein such application is to be made.  Such an enactment would sufficiently manifest the State Legislature's intent that wiretapping be permissible if undertaken under judicial order.  Any warrant issued under such a limited State authorization would be measured against the specific provisions of Title III.

Thus, if certain provisions of the Massachusetts wiretap statute fail to meet the requirements of the Federal act,

---

[12] The defendants point to several particulars in which they allege that the Massachusetts statute is deficient relative to the Federal requirements.  They argue that since the statute and the resulting applications and orders fall short of the requirements of § 2518 the wiretaps cannot stand.  These aspects of the State statute are discussed in part F, *infra*.

the crucial question would be whether the Massachusetts statute is severable, that is whether the Legislature intended that the authorization sections remain in effect despite the finding of invalidity of certain other sections.

We are of opinion that the Massachusetts statute is severable and that, assuming the potential inoperability through Federal preemption of certain provisions of the State statute, the warrants issued in these cases would be valid as long as the authorization sections of the State statute are valid and the warrants themselves meet the Federal standards. However, we need not rest our decision on this basis alone because we find, on reasoning discussed below, that the Massachusetts statute, in the several particulars challenged by the defendants, is not repugnant to the provisions of the Federal act and is accordingly not preempted. Before any detailed examination of specific provisions, we first state the general principles guiding our conclusions with respect to preemption.

E.  *The Question of Preemption.*

Given the express grant of enabling power to the States in § 2516 (2), it is indisputable that Congress did not intend to supersede State law entirely. Cf., e.g., *Pennsylvania* v. *Nelson*, 350 U. S. 497 (1956). Moreover, it is evident that Congress did not conclude, nor is the conclusion required by the nature of the activity, that regulation of wiretapping orders to be issued from State courts admits only of one uniform standard. Cf. *Cooley* v. *Board of Wardens of the Port of Philadelphia*, 12 How. 299 (1851). This follows because Title III expressly recognizes that States may prohibit all wiretapping within their borders[13] for State criminal law enforcement purposes or may adopt procedures and standards more restrictive than the Federal act. Thus, the degree of

---

[13] So far at least twenty-two States have enacted legislation authorizing wiretap warrants under State law.

restriction, indeed the very permissibility of wiretapping for law enforcement purposes may differ among States. The only uniform and absolute requirement imposed on all States is that there be in effect a State statute authorizing the appropriate principal prosecuting attorneys to apply to the appropriate State courts of competent jurisdiction. *People* v. *Conklin,* 12 Cal. 3d 259 (1974), app. dism. sub nom. *Conklin* v. *California,* 419 U. S. 1064 (1974). *State* v. *Siegel,* 266 Md. 256 (1972).

Although we deal with an express congressional provision allowing for concurrent State regulation in Title III, in determining whether provisions of the Massachusetts statute are preempted by Title III, and hence invalid under the supremacy clause of the Federal Constitution, we are guided by the standard applied in general preemption cases: that is, among other considerations, whether the State statute impairs the superintendence of the field by Congress. *Florida Lime & Avocado Growers, Inc.* v. *Paul,* 373 U. S. 132, 142 (1963). A State statute would be preempted where the State law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress. *Hines* v. *Davidowitz,* 312 U. S. 52, 67 (1941). *Goldstein* v. *California,* 412 U. S. 546, 560-561 (1973). Cf. *Bloom* v. *Worcester,* 363 Mass. 136, 151-152 (1973). Preemption, however, is not to be lightly inferred where Congress has allowed for concurrent State regulation as long as the State statute is substantially similar in design and effect to the Federal enactment or where the State statute is, according to congressional directive, more restrictive. *Askew* v. *American Waterways Operators, Inc.* 411 U.S. 325 (1973).

As the Senate Report states at 2187, in issuing a wiretap warrant pursuant to State law the judge must make findings that are "the *substantial equivalent* to those required by section 2518 (3)" and the order itself is "to be made in *substantial conformity* with the standards set out in section 2518" (emphasis supplied).

Thus the more pertinent concerns are whether the Massachusetts act *conflicts* with the Federal act by failure to ensure the same or similar protections as Title III where a wiretap order is sought in a State court.

F. *The State Statute Complies with the Federal Requirements.*

The defendants point out several particulars in which they argue that the Massachusetts statute fails to conform to Title III. The provisions that are challenged relate generally to (1) the authority of assistant district attorneys to apply for wiretap orders; (2) the requirement that the wiretap order be proved necessary in that other investigative procedures have been tried and failed; (3) requirements that the order identify the agency authorized to intercept, contain statements providing that it be executed as soon as practicable, and be conducted in such a way as to minimize the interception of communications; (4) the provision for recording, sealing of tapes, and the serving of notice and inventory; and (5) designated offenses for which a wiretap order may be obtained. [14]

Before we turn to the specifics of the provisions challenged by the defendants, we note that the Massachusetts statute in major portion matches section for section the provisions of Title III. Admittedly, the phraseology of our State statute is not word for word that of the Federal act. However, in substance the requirements of the Massachusetts statute are the same as those of Title III, as the legislative history of Title III shows that they should be. [15]

---

[14] In addition, the defendants challenge the provisions of the warrants themselves, claiming that the warrants, in certain respects and most particularly in reference to termination provisions, return, notice, and sealing procedures, failed to meet the requirements of both the Federal and State statutes. These arguments are examined later in this Appendix.

[15] That the Massachusetts statute parallels the Federal provisions in

We point out these factors simply to put in perspective the claims of the defendants with respect to alleged deficiencies in the State act. We do not say that the omissions and differences on which the defendants rely are de minimis simply because they exist in a larger

---

substance, rather than in text, is illustrated by comparing the provisions of the two statutes. For example, § 2518 (1) (a)-(f) sets forth what the application for a wiretap order must contain, so that the judge in Federal proceedings may assess probable cause and other necessary considerations. A comparison of G. L. c. 272, § 99 E and F, reveals that these sections set forth requirements for State proceedings that are virtually identical to § 2518 (1) (a)-(f).

Moreover, and most importantly, in certain respects the Massachusetts statute is more restrictive than Title III. For example, § 99 F imposes, beyond the Federal conditions, the requirements that the application state (1) that the communications are not legally privileged; (2) if practicable, the hours of the day or night during which communications subject to the order may be reasonably expected to occur; and (3) if it is necessary to make secret entry, a statement to that effect. In addition, § 99 I provides that the warrant shall permit interception for a continuous period not to exceed *fifteen* days within a thirty-day period, whereas § 2518 (5) permits interception for the full thirty-day period. Unlike the Federal act, § 99 is more restrictive in that it does not allow for emergency interception without prior judicial authorization. Cf. § 2518 (7). Further, the State statute imposes more stringent requirements with respect to the return. The Federal statute requires only that the recordings be made available to the issuing judge. § 2518 (8) (a). Section 99 M provides for additional information including: (a) a statement of the nature and location of the communication facilities, if any, and premises or places where the interceptions were made; (b) the periods of time during which such interceptions were made; (c) the names of the parties to the communications intercepted, if known; (d) the original recording of the oral or wire communications intercepted, if any; and (e) a statement attested under the pains and penalties of perjury by each person who heard oral or wire communications as a result of the interception authorized by the warrant, which were not recorded, stating everything that was overheard to the best of his recollection at the time of the execution of the statement. Finally, with respect to the mandatory service of notice and warrants, § 99 L imposes a thirty-day limit for service of the warrant on a showing of exigent circumstances as compared to § 2518 (8) (d) setting a ninety-day limit. The State statute limits postponement of service to three years, the Federal act imposes no such limitation.

scheme. The point is that it would be impractical here to set out in total the two statutes and, therefore, it should be borne in mind that the provisions examined below are discrete points in a complex and multisectioned legislative scheme.

(1) State Attorneys Authorized to Apply for Wiretap Warrants.

The Massachusetts statute, G. L. c. 272, § 99 F 1, provides: "F. Warrants: application. 1. Application. The attorney general, any assistant attorney general specially designated by the attorney general, any district attorney, or any assistant district attorney specially designated by the district attorney may apply ex parte to a judge of competent jurisdiction for a warrant to intercept wire or oral communications. Each application ex parte for a warrant must be in writing, subscribed and sworn to by the applicant authorized by this subparagraph."

The defendants argue that this is an improper delegation of authority and is in conflict with § 2516 (2), the Federal enabling provision for State-initiated wiretap orders. That section in pertinent part provides: "The principal prosecuting attorney of any State, or the principal prosecuting attorney of any political subdivision thereof, if such attorney is authorized by a statute of that State . . . may apply . . . for . . . an order authorizing, or approving the interception of wire or oral communications."

Our attention is directed to the difference between the provisions of § 2516 (1) regulating Federal and State wiretaps. That section relating to Federal orders provides that the Attorney General or any specially designated assistant attorney general may *authorize* an application; § 2516 (2), relating to State orders, provides that the State's principal attorneys may *apply* for wiretap orders.

The defendants concede that to require the personal appearance of a State's principal prosecuting attorneys before the issuing judge in all instances would impede

enforcement of the State criminal law; they do not assert that § 2516 (2) mandates such a personal appearance. See *United States* v. *Tortorello*, 480 F. 2d 764, 776 (2d Cir. 1973), cert. den. 414 U. S. 866 (1973). Rather, the defendants contend that "to apply" means that the district attorney, if he is the principal prosecuting attorney in a case, must affirmatively demonstrate some familiarity with the application, thereby providing an indication that he reviewed the merits of the particulars of the application.

Emphasizing the term that the district attorney must *apply*, the defendants submit that a delegation of authority to the assistant district attorney empowering him to apply for the warrant is improper and in conflict with the Federal enabling section; that as a consequence the State statute is invalid in this regard; and that since the warrants issued in these cases were applied for by an assistant district attorney, the warrants are invalid. Hence, if the defendants' position is correct, all evidence seized thereunder would be suppressed. § 2518 (10) (a). See generally, *United States* v. *Giordano*, 416 U. S. 505 (1974); *United States* v. *Chavez*, 416 U. S. 562 (1974).

We do not think that the term "apply" in § 2516 (2) is to be so narrowly read as the defendants suggest. We base our conclusion on the statutory language of Title III, the legislative history of the act, and the reasoning of certain other decisions which have construed this section. See, e.g., *United States* v. *Giordano, supra*; *United States* v. *Chavez, supra*; *United States* v. *Tortorello, supra*; *United States* v. *Lanza*, 341 F. Supp. 405 (M. D. Fla. 1972). For the reasons discussed below, we hold that the authorization procedures under the Massachusetts statute whereby an assistant district attorney is "specially designated" by the district attorney comport with the Federal enabling authority.

The Senate Report, which analyzes section by section the provisions of Title III, with respect to § 2516 (2) states: "Paragraph (2) provides that the principal prose-

cuting attorney of any State or the principal prosecuting attorney of any political subdivision of a State may *authorize* an application to a State judge of competent jurisdiction, as defined in section 2510 (9), for an order authorizing the interception of wire or oral communications. *The issue of delegation by that officer would be a question of State law.* In most States, the principal prosecuting attorney of the State would be the attorney general. The important question, however, is not name but function. . . . *Who that officer would be would be a question of State law"* (emphasis supplied). Sen. Rep. at 2187.

We, of course, agree that the statutory authority to apply for wiretap orders should "be used with restraint and only where the circumstances warrant the surreptitious interception of wire and oral communications." *United States* v. *Giordano,* 416 U. S. 505, 515 (1974). In order to ensure that restraint, the authority to seek wiretap orders should be restricted to those State authorities who, on reasoned judgment, may determine whether as matter of uniform law enforcement policy within their jurisdiction the initiation of wiretap procedures are proper and required. The determination at this level is more than a matter of necessity in the search for evidence, it is a matter of policy (*United States* v. *Tortorello, supra,* at 777), a policy to be established and uniformly enforced on a jurisdictionally wide level, in this Commonwealth on a county-wide basis.

Thus, in narrowly circumscribing those State enforcement authorities who may apply for wiretap orders, Congress sought to ensure uniform and consistent standards for wiretap orders. We take note of the fact that, in contrast to the procedure for search warrants in general, investigative personnel may not themselves apply to a judge for authority to wiretap or eavesdrop. As stated in the Senate Report on § 2516 (2): "The intent of the proposed provision is to provide for the centralization of policy relating to statewide law enforcement in the

area of the use of electronic surveillance in the chief prosecuting officer of the State." Sen. Rep. at 2187. In order to ensure centralization, the lines of responsibility must be clearly drawn. We are of opinion, based on our examination of the wiretap procedures set forth in the Massachusetts statute, that the authorization provisions of G. L. c. 99 F 1 comport with these requirements.

We attach much weight to the fact that the assistant district attorney must be *specially designated* by the district attorney. We interpret that to mean that an assistant district attorney may not apply at will for wiretap orders but must bring the matter for examination before his senior officer, the district attorney. In Massachusetts the greater portion of the prosecution of crime is commenced by district attorneys. The Commonwealth has ten district attorneys, seven of whom are elected on a county-wide basis while the remaining three are elected in units composed of either two or three counties. G. L. c. 12, § 13.

We construe the provision for special designation[16] to mean that the Attorney General or the district attorney is to determine whether a particular proposed use of electronic surveillance would be consistent with the overall policy in respect to monitoring followed in his jurisdiction, and to this end the respective attorney must review and authorize each such application in writing. Through this process the necessary centralization is provided for as is the concomitant protection that the individual with final authority to regulate electronic surveillance be subject to public accountability.

---

[16] The determination, whether an assistant district attorney should be specially designated, would require not a cursory but full examination by the district attorney of the application. There is nothing in this record to indicate that the district attorney did not so review these applications. Further, the signed letters of special designation limited to these specific wiretaps in our view sufficiently establish the lines of responsibility to the district attorney as a central authority figure accountable to the courts and the public.

To read § 2516 (2) as limiting the Attorney General or the district attorney, by requiring that he personally apply for wiretap orders or affirmatively demonstrate total familiarity with all aspects of a case would, in our opinion, serve no purpose not accomplished by authorization of an application by a district attorney followed by special designation to an assistant district attorney to apply therefor.[17]  Moreover, the practice of authorizing an assistant district attorney to apply is beneficial in that such assistant district attorney, through his closer association with investigation of the case, may more completely and adequately respond to the judge's inquiry with respect to the requirements of the State and Federal statutes requiring proof that probable cause exists.

The legality of the delegation of authority allowed under the Massachusetts statute is distinguishable from the delegation found improper in *United States* v. *Giordano*, 416 U. S. 505 (1974).  In that case, contrary to the express provisions of § 2516 (1) requiring that "[t]he Attorney General, or any Assistant Attorney General specially designated by the Attorney General, may authorize an application to a Federal judge," discretion to authorize wiretaps had been delegated to the United States Attorney General's executive assistant.  In addition the application inaccurately described the official who had authorized the issuance.

Our decision in this regard is in substantial accordance with that reached in *United States* v. *Tortorello*, 480 F. 2d 764 (2d Cir. 1973), cert. den. 414 U. S. 866 (1973) (district attorney need not personally appear before

---

[17] It appears that the delegation to Federal assistant attorneys general is not so narrowly circumscribed. See § 2516 (1). Nevertheless, we emphasize that the special designation of a State assistant attorney general or assistant district attorney must be on a case by case basis with written authorization from the Attorney General or district attorney. This specific authorization in each case satisfies the standards of Title III even if that statute is read to require that the State Attorney General apply for the warrant. However, we do not so read Title III. See text above.

issuing judge where assistant district attorney appears).
See *United States* v. *Lanza,* 341 F. Supp. 405 (M. D.
Fla. 1972) (Governor acting pursuant to State statute was
within provisions of Federal statute authorizing principal
prosecuting attorney to obtain wiretap order). Cf.
*United States* v. *Manfredi,* 488 F. 2d 588, 601 (2d Cir.
1973), cert. den. 417 U. S. 936 (1974).

Our review of the State statute with respect to the
prosecuting attorneys empowered to apply for a wiretap
warrant, particularly the delegation to the assistant
district attorney challenged here, convinces us that the
State procedures adequately ensure the centralization,
uniform enforcement policy, and public accountability
deemed necessary by § 2516. Accordingly, we find that
the provision does not conflict with the Federal legisla-
tion and is not preempted.

(2) *Authorized Thirty-day Period.*

Section 2518 (5) provides in pertinent part, "No order
entered under this section may authorize or approve the
interception of any wire or oral communication for any
period longer than is necessary to achieve the objective of
the authorization, nor in any event longer than thirty
days." General Laws c. 272, § 99 I 2, provides that the
warrant must contain "[t]he date of issuance, the date of
effect, and termination date which in no event shall
exceed thirty days from the date of effect. The warrant
shall permit interception of oral or wire communications
for a period not to exceed fifteen days. If physical instal-
lation of a device is necessary, the thirty-day period shall
begin upon the date of installation."

The defendants' contention that the Federal statute
does not allow for the running of the thirty-day period
from the date of installation of the intercepting device is
contradicted by the Senate Report on § 2518 (5) which
states, "The period of authorized interception is intended
to begin when the interception — in fact — begins and
terminates when the interception — in fact — termi-
nates. This will be a question of fact in each case. . . .

A wiretap can take up to several days or longer to install." Sen. Rep. at 2192.

It is clear, of course, that installation of the necessary intercepting equipment should be effected forthwith, that is, with all due speed. A reasonable time for implementation of mechanical systems is necessary and is permissible under the statutes, but unjustifiable delay will result in suppression of intercepted communications because any such unreasonable delay in installation would improperly extend the outside limit for termination, i.e., thirty days. In this regard the provision allowing for commencement of the period of interception on installation is to be read in conjunction with the requirement for immediate execution of the warrant discussed below. Cf. *Commonwealth* v. *Cromer,* 365 Mass. 519 (1974). Construed in this manner, the thirty-day outside limit on authorized time of interception is closely circumscribed while allowing for a reasonable time in which mechanical installation can be made.

With respect to determining the period of authorization from the date of installation we note that the Massachusetts statute in this regard is not only in accordance with the Federal requirements but is in fact more restrictive in terms of the fifteen-day total on the number of days in which interceptions may be made within the thirty-day authorized period.

(3) Alternative Investigative Procedures.

The defendants' claim that the State statute fails to require, as § 2518 (1) (c) specifies, that the application contain "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous" is without merit. General Laws c. 272, § 99 E 3, specifically provides that a warrant may issue only on such a showing by the applicant.

(4) Identification of Agency Authorized to Intercept.

Section 2518 (4) (d) requires that the order identify the person authorizing the application and the agency authorized to intercept. See generally *United States* v. *Chavez,* 416 U. S. 562 (1974). General Laws c. 272, § 99, does not expressly so provide. Considering the fact that such a provision is more properly directed toward ministerial or reporting duties than to the substance of the order, *United States* v. *Chavez, supra,* at 575-580, we are of the view that the absence, from the Massachusetts statute, of an express reference to the agency authorized is not crucial, since the requirement of agency identification may be fairly implied in the State statute. Thus, it is reasonable to assume that the Legislature intended that wiretap warrants include a provision identifying the authorities applying therefor and directed to execute them, and we so construe § 99.[18]

(5) Execution as Soon as Practicable.

In defining the specifics that must appear in the order, § 2518 (5) prescribes, inter alia, that "[e]very order and extension thereof shall contain a provision that the authorization to intercept shall be executed as soon as practicable." We believe that § 99, taken as a whole, requires such immediate execution and that, in lieu of the phrase "as soon as practicable," the requirement for prompt execution is ensured by § 99 I 2 which, in defining the form and content of the warrant, states that the warrant must contain "[t]he date of issueance, the date of effect, and termination date."[19] In setting these dates, the issuing judge must of necessity review the

---

[18] The wiretap warrants issued in these cases were expressly directed to the "District Attorney for the County of Suffolk, His Specially Designated Assistant District Attorney, and His Designated Investigative and Law Enforcement Agents," thus adequately identifying the agency authorized to intercept.

[19] The Federal statute does not expressly provide for this specificity with regard to the date of effect.

proposed date of effect which is, in other words, the date of execution, and he is therefore in a position to ensure that the warrant be executed promptly.

Moreover, it must be assumed that the Legislature was aware of the requirements of probable cause. It is well established by the law of this Commonwealth that in the determination of probable cause time is of the essence, and that a search warrant is to be executed immediately, that is, without unreasonable delay. *Commonwealth* v. *Cromer*, 365 Mass. 519, 522-523 (1974). Cf. G. L. c. 276, § 2A. Thus in order for a warrant to be validly executed it must be executed before the finding of probable cause is stale. *Sgro* v. *United States*, 287 U. S. 206 (1932). We think it inconceivable that the Legislature would so assiduously seek to ensure the requisite degree of particularity with respect to probable cause (see, e.g., G. L. c. 272, §§ 99 E F I), without requiring that the warrant issued pursuant to such a finding of probable cause be executed forthwith.[20]

Of course, in any case where a substantial claim of delayed execution is raised, the aggrieved person against whom such evidence is offered may contest on Fourth Amendment grounds the continuing validity of the finding of probable cause. See *Sgro* v. *United States, supra.* However, given the specific time sequence set forth in § 99 F 2, delayed execution will be unlikely where the issuing judge reviews the proposed dates and directs that the order be executed accordingly.

(6) *Minimization.*

In addition to the requirement that the order contain a provision that the authorization to intercept be executed as soon as practicable, § 2518 (5) also provides that the

---

[20] The warrants at issue here provide: "Whereas the application for authority to intercept the wire communications as aforesaid complies with the provisions, purposes and procedures of Section 99 . . . .. We Command You and each of you *forthwith*, with necessary and proper systems to intercept any communications" (emphasis supplied).

Commonwealth v. Vitello.

order shall contain a provision that the interception "be conducted in such a way as to minimize the interception of communications not otherwise subject to interception under this chapter." The State statute has no *express* equivalent. The exact nature of the minimization requirement is less than clear.

There is no detailed legislative history on the provision for minimization. The Senate report simply reiterates the statutory language. Most probably the requirement of minimization seeks to remedy the infirmity in the wiretap statute at issue in *Berger* v. *New York*, 388 U. S. 41, 59 (1967), wherein "the conversations of any and all persons coming into the area covered by the device will be seized indiscriminately and without regard to their connection with the crime under investigation." In effect, then, the purpose of minimization is to limit the intrusion so that communications not otherwise subject to interception will not be indirectly monitored, causing a serious interference with rights of privacy.

We are of the view that the absence of the express word "minimize" in the State statute or a warrant is not fatal as long as the State procedures fully and effectively achieve that result.[21] Minimization has been interpreted as requiring that the agency authorized to intercept show a high regard for rights of privacy and take all measures reasonable to avoid unnecessary intrusion. *United States* v. *Cox*, 462 F. 2d 1293 (8th Cir. 1972), cert. den. 417

---

[21] In these cases the defendants have raised no claim that the surveillance was conducted beyond the scope of the orders and have not alleged that nonpertinent calls were intercepted, fully heard, or recorded. We therefore need not reach the question whether the interceptions were in fact properly limited in scope. However, given the extent of the criminal enterprise under investigation, the location and operation of the subject telephones, and the type of offenses under investigation, the defendants in all probability would face great difficulty in seeking to establish that the intrusion in these cases was unnecessarily broad. See, e.g., *United States* v. *Tortorello, supra*; *United States* v. *Bynum*, 485 F. 2d 490, 500-502 (2d Cir. 1973); *United States* v. *James, supra*, at 1018-1023.

U. S. 918 (1974). *United States* v. *Tortorello*, 480 F. 2d 764, 784 (2d Cir. 1973), cert. den. 414 U. S. 866 (1973). *United States* v. *James*, 494 F. 2d 1007, 1018 (D. C. Cir. 1974), cert. den. sub nom. *Tantillo* v. *United States*, 419 U. S. 1020 (1974). The Massachusetts statute authorizing wiretap warrants guarantees these protections.

We note that § 99 F 2 e in setting forth the requirements which must be contained in the application has provisions, not found in the Federal statute, which require the inclusion of a statement that the oral or wire communications sought to be intercepted are *material* to a particularly designated offense and a statement that such communications are not legally privileged. Section 99 F 2 f imposes an additional State requirement that, if practicable, the application shall designate hours of the day or night during which oral or wire communications may be reasonably expected to occur. See, e.g., *United States* v. *Fino*, 478 F. 2d 35, 37 (2d Cir. 1973), cert. den. 417 U. S. 918 (1974) (giving of general instructions for minimization, including hours of day when telephones could be tapped, was sufficient compliance with the statute). And, of course, the warrant itself must contain " [a] particular description of the nature of the oral or wire communications sought to be overheard." Section 99 F 2 d. In addition, § 99 M e, in describing the procedure for the return of the warrant, provides that the agent "who heard oral or wire communications as a result of the interception authorized by the warrant, which were not recorded, shall state everything that was overheard to the best of his recollection at the time of the execution of the statement."[22] To some extent, the

---

[22] Moreover, a showing that some of the conversations listened to completely were in fact nonpertinent would not necessarily violate the minimization requirement as long as good faith effort had been made to achieve minimization. *United States* v. *Cirillo*, 499 F. 2d 872, 881 (2d Cir. 1974), cert. den. 419 U. S. 1056 (1974). See *United States* v. *Tortorello*, 480 F. 2d 764 (2d Cir. 1973), cert. den. 414 U. S. 866 (1973); *United States* v. *Bynum*, 485 F. 2d 490, 500-502 (2d Cir.

affirmative and express grant of authority to intercept communications, particularly described, necessarily implies the exclusion of nonmaterial conversations.

We are mindful of the fact that the Federal statutory scheme requires that the order shall contain a provision that the wiretaps "shall be conducted in such a way as to minimize the interception of communications not otherwise subject to interception under this chapter." § 2518 (5). However, the phrase minimization is not magical and the requirement to limit surveillance to that necessary and authorized under the warrant should be considered in light of the particularity with which the conversations to be intercepted are described. *United States* v. *Tortorello, supra.* *United States* v. *James, supra.*

Supportive of this reasoning is the fact that the Federal courts have held that the absence of a directive in the order for minimization does not necessarily render the order invalid and the communications obtained thereunder inadmissible. In *United States* v. *Manfredi,* 488 F. 2d 588, 598 (2d Cir. 1973), cert. den. 417 U. S. 936 (1974), it was held that the wiretap orders were not "vitiated by virtue of omission of the talismanic minimization language." The court reasoned that it was proper to read the orders and the supporting affidavits together and that in any event minimization was in effect "a summation of the more specific requirements" relating to the particularity with which the warrant described the communication to be intercepted.[23] In *United States* v.

---

1973). Nor is it clear that a failure to minimize will result in total suppression of all wiretap evidence. Several courts have held that only suppression of non-pertinent calls is required. Compare *United States* v. *Cox,* 462 F. 2d 1293 (8th Cir. 1972), cert. den. 417 U. S. 918 (1974); *United States* v. *King,* 335 F. Supp. 523 (S. D. Cal. 1971), revd. on other grounds, 478 F. 2d 494 (9th Cir. 1973), cert. den. sub nom. *Light* v. *United States,* 414 U. S. 846 (1973), with *United States* v. *Scott,* 331 F. Supp. 233 (D. D. C. 1971).

[23] The requirements under the applicable State law, that of New

*Cirillo,* 499 F. 2d 872, 880-881 (2d Cir. 1974), cert. den. 419 U. S. 1056 (1974), the court termed omission of the minimization directive a "technical defect" where the officers conducting the wiretaps were aware of the minimization requirement and abided by it. Knowledge of the minimization requirement, the court reasoned, could be inferred from the supporting affidavits which, in particularly describing the conversation sought to be intercepted, evinced an actual knowledge of the minimization requirement.[24] (The inference was made although the supporting affidavits contained no specific agreement to limit the seizure of conversations.) Thus the court held that omission of minimization language from a wiretap order, otherwise in compliance with the applicable statute, would not render the warrant invalid. A similar analysis would in our opinion apply to the absence of the express phrase "minimization" in our State statute.

As the plethora of Federal cases on minimization illustrates, the purpose of including the minimization

---

York, are substantially similar to those of § 99 and relate to (1) the name of the person, if known, whose communications are to be intercepted, (2) the nature and location of the communications facilities as to which authority to intercept is granted, (3) a particular description of the type of communications sought to be intercepted, (4) a statement of the particular designated offense to which they relate, (5) the identity of the law enforcement agency authorized to intercept, and (6) the period of time during which the interception is authorized. See 488 F. 2d at 597, fn. 6 (2d Cir. 1973).

[24] In the *Cirillo* case, the agents in charge of the investigation submitted affidavits stating that they were aware of the minimization requirement and that instructions to limit the surveillance were given to the officers and agents conducting the wiretap. We note that § 99 M requires the filing of a statement by the persons who have intercepted the communications as to the extent of the surveillance and the conversations overheard. Under § 99 O, before any evidence derived from the intercepted communications is offered in a criminal trial, the defendant shall be served with a copy of each document and item which make up the application, order, and return. Consequently, a defendant would have access to the affidavit filed under § 99 M.

directive is to ensure that the agents conduct the wire-
taps within the specific limitations of the order and avoid
any improper intrusion on rights of privacy. In our view
the provisions of the Massachusetts statute, fairly con-
strued, serve this purpose in that they make clear to the
executing officer that his surveillance is to be limited to
conversations *material* to designated offenses under
investigation. In this regard we note that the defend-
ants in these cases made no attempt to show that any of
the conversations recorded were not pertinent to the
State's investigation and have made no claim that they
were in any way prejudiced by the manner in which the
wiretaps were executed. *In re LoChiatto*, 500 F. 2d 434
(1st Cir. 1974).

While one means to ensure appropriate limits on the
authorized surveillance is to include the phrase "minimi-
zation" in the order, that method, as the Federal cases
indicate, is not exclusive. Thus we conclude that the
absence of an express reference to minimization in the
Massachusetts statute is not fatal. We caution, however,
that every order issued under the State statute must fully
ensure that the surveillance is limited to proper objec-
tives, and protective of rights of privacy. The require-
ment that the intrusion be limited is important in
effectuating Fourth Amendment rights, and it is quite
clear that under our State statute, in any particular case,
the failure to limit the interception to matters material to
the designated crime which is the subject of the inter-
ception may result in suppression of certain inter-
cepted communications. The limitations on hours and
manner of execution are helpful in this regard, but the
directive of the order and the instructions given there-
with should be clear and unambiguous so that the
executing officers are aware of and abide by the limita-
tions of the order.

(7) Return and Sealing.

Section 2518 (8) (a)-(b) requires that, on expiration of
the order, the recording obtained thereunder shall be

made available to the issuing judge and with the application and orders granted shall be sealed under his direction and held for ten years. The Massachusetts statute requires the return of the warrant within seven days of termination, does not specify that the issuing judge shall *seal* the recording and provides that the application, warrant, renewal orders and return shall be kept for five years. §§ 99 M and N. We conclude that the provisions of § 99, in so far as they do not provide that the recording be kept for the requisite ten-year period, are invalid. Therefore, Massachusetts officials in order to comply with Federal requirements must henceforth keep all tapes and documents for ten years. This would include the tapes recorded in these cases as well as all currently held tapes and papers.

However, with respect to the requirement for prompt return to the issuing judge, the State statute is not in conflict with § 2518 (8) (a) in that seven days is the outside limit on return of the warrant, and is not to be read as sanctioning a delay in return if it is practicable that a return be made before expiration of the seven-day period.[25]

Nor is the State statute for preserving the recording inconsistent with the Federal requirement of sealing. Section 99 N 1 provides that the issuing judge shall examine the return which contains the original recording and, after determining whether the return complies with the statutory provisions, shall order the transmittal to the Chief Justice of the Superior Court of the application, all renewal applications, the warrant, all renewal orders, and the return and "[t]heir contents shall not be disclosed." Sealing of the documents would be an appropriate means of preserving these documents and should be utilized in order to conform the State provision to that

---

[25] The defendants' claim that the returns in these cases were not made in compliance with the applicable statutes is discussed in part G, *infra.*

of § 2518 (8) (a).   Implemented in this manner, § 99 N meets the Federal requirements.

(8) Inventory.

Contrary to the defendants' claim, we find that service of an attested copy of the warrant, pursuant to § 99 L, on the person whose oral or wire communications were intercepted provides adequate access to the information prescribed by § 2518 (8) (d).   We point out that § 99 L provides for service prior to execution of the warrant or, on a showing of exigent circumstances, within thirty days after termination with continued secrecy limited to three years.   These time limitations are more stringent than those imposed by § 2518 (8) (d).

(9) Designated Offenses.

The defendants are without standing to raise the claim that the Massachusetts statute on its face exceeds the scope of § 2516 (2) in that it allows for the use of electronic surveillance in crimes not designated in the Federal act.[26]   The crimes for which the defendants were indicted clearly fall within the designated offenses.   Since the statute may be validly enforced against the defendants, they may not be heard on a claim that the statute may not be properly enforced against others.   *Yazoo & Miss. Valley R.R.* v. *Jackson Vinegar Co.* 226 U. S. 217 (1912).   *Broadrick* v. *Oklahoma,* 413 U. S. 601 (1974).

G.   *The Wiretap Warrants Are Facially Valid and Were Properly Executed.*

In addition to their claim that the State statute pursuant to which these warrants were issued is invalid, the defendants also attack the warrants as facially

---

[26] We have examined the defendants' claim that the orders in these cases were invalid in that they were issued to detect violations of G. L. c. 271, § 17A (not a designated offense in § 2516 [2]), as well as violations of G. L. c. 271, § 17, and we agree with the Commonwealth that the applications were not based on § 17A.   The single reference to § 17A in the applications merely informs the issuing judge that violations of § 17 which are recorded on a telephone are per se violations of § 17A.

invalid. The defendants argue that the two warrants, that of April 24, 1972, and that of May 10, 1972, are deficient with respect to the termination dates required by § 99 I and § 2518 (4) (e) and (5); the postponement of notice; and the omission of minimization language. In addition, the defendants contend that the return and notice procedure, as well as the sealing of the tapes, was not performed in compliance with the statutory provisions. Finally, the defendants assert that utilization of pen registers was beyond the scope of the warrants.

Certain of these assertions, e.g., the minimization argument, are answered by our previous discussion of the relevant portions of the State statute. However, the arguments we address here go not to the facial validity of the State statute, analyzed in parts A through F of this Appendix, but rather relate to the specifics of these warrants.

The standard for suppression because of alleged deficiencies in a wiretap warrant, at least with respect to Federal requirements, "does not turn on the judicially fashioned exclusionary rule aimed at deterring violations of Fourth Amendment rights, but upon the provisions of Title III." *United States* v. *Giordano*, 416 U. S. 505, 524 (1974). In that regard, suppression is required, not in all instances, but where there has been a "failure to satisfy any of those statutory requirements that directly and substantially implement the congressional intention to limit the use of intercept procedures to those situations clearly calling for the employment of this extraordinary investigative device." *Id.* at 527. In resolving this issue, the court's inquiry should be directed toward determining, among other things, whether the particular procedure involved is a central or functional safeguard to prevent abuses in electronic surveillance as opposed to a procedural or reporting mechanism (*United States* v. *Chavez*, 416 U. S. 562, 578 [1974]); whether the purpose that the particular procedure was designed to effect has been accomplished in spite of the error (*id.* at 575); and,

whether the statutory requirement was deliberately ignored and, if so, whether this was done to gain an unfair tactical advantage. *Id.* at 572-573. See generally *United States* v. *Chun*, 503 F. 2d 533, 541-542 (9th Cir. 1974). For our purposes, a similar analysis seems appropriate with respect to the State statutory requirements.

(1) Termination Dates.

The April 24, 1972, warrant states that, whereas the application complies with the provisions of State law, the specially designated assistant district attorney and his designated investigative agents may forthwith "tap and make connection with any and all wires leading to the telephone instrument *as of this date* [April 24]" (emphasis supplied), and further provides "that such interception procedure be employed for a period not exceeding 15 days, from 11:00 a.m. to 7:30 p.m. within the 30-days *next following the date of the installation*" (emphasis supplied).

The defendants raise two points with respect to this warrant: first, that no termination date as such appears, and second, that the Federal statute does not allow for the running of the thirty-day period from the date of installation. We have answered the latter claim in an examination of the State statute. With respect to the former claim, we are of opinion that this warrant on its face does provide a termination date computed from the stated date of issuance and installation. As the warrant states, this wiretap is to commence "as of this date" and is limited to fifteen days "within the 30-days next following the date of installation." Although it could be suggested that the phrase "as of this date" modifies and refers to wires leading to the telephone as of April 24, we think by far the most logical interpretation is that the reference is to the date of issuance. The defendants do not claim to the contrary. Thus, the applicable limits for termination are stated with sufficient clarity and do specifically establish termination.

With respect to the second wiretap warrant, dated May 10, 1972, the defendants raise what we regard as a more serious and substantial claim in that the second warrant does not on its face contain any dated termination provision.

At the hearing on the motions to suppress the contents of the wiretap interceptions, the assistant district attorney stated that although his intent was to apply for authority to wiretap for only fifteen days within the period of thirty days next succeeding May 10, 1972, this language was omitted from the warrant, a proposed copy of which was prepared in the district attorney's office. The assistant district attorney further stated that the omission was due to a typographical error and a failure to proofread the document accurately. In regard to these omissions, the judge of the Superior Court found: "By error and inadvertence, the lines in the warrant relating to the time limitations . . . [were] not typed in by the typist. The omission was not discovered by proofreading. It was not the intention of Mr. Snider to ask for nor to obtain a warrant without a time limitation. I infer that Mr. Justice Lurie was unaware of the absence of the time limitation when he signed and issued the warrant."

The defendants argue that invocations of error and inadvertence cannot save this warrant, and in most circumstances we would agree with them. However, the Commonwealth argues, on the other hand, that the warrant should be read in conjunction with the application; that the application for purposes of establishing the dates of permissible interception should be deemed incorporated in the warrant; and that so read the warrant is properly limited in effect. The application specifically stated: "(11) That the interception is required to be maintained for a period of 15 calendar days, commencing on the date of installation of the intercepting device, and that the hours of each day during which wire

communications may be reasonably expected to occur are those between the hours of 11:00 a.m. to 7:30 p.m." We find this analysis persuasive.

In *Commonwealth* v. *Todisco,* 363 Mass. 445 (1973), we held that in certain circumstances, particular descriptions contained in the supporting affidavits could be deemed incorporated in the warrant so as to supplement particularity requirements. In that case, as in the instant cases, the police officer who made the affidavit was involved in executing the warrant and could therefore be deemed aware of the limitations on the warrant with regard to the materials to be seized.[27] See *Commonwealth* v. *Pope,* 354 Mass. 625 (1968), where we held that a complaint particularly describing the place to be searched could be read in support of the warrant and, so read, provided an adequate description of the premises to be searched. Cf. *Commonwealth* v. *Stevens,* 362 Mass. 24 (1972); *Commonwealth* v. *Snow,* 363 Mass. 778 (1973); *United States* v. *Ventresca,* 380 U. S. 102 (1965); *United States* v. *Desist,* 384 F. 2d 889 (2d Cir. 1967), affd. 394 U. S. 244 (1969). That the warrants in the instant cases involved the interception of wire or oral communications does not mean that the warrants are of a novel genre to which previously established law is inapplicable. We agree with the decision of the Court of Appeals which in *United States* v. *Manfredi,* 488 F. 2d 588, 598 (2d Cir. 1973), cert. den. 417 U. S. 936 (1974), held that both the order and the supporting affidavits are to be read in "a commonsense and realistic fashion," quoting from *United States* v. *Ventresca, supra,* at 108.

Our analysis is in line with the reasoning of a number of courts which have held that inadvertent omissions of specific provisions from a wiretap order need not result in

[27] In these cases Officer John C. O'Malley, a detective assigned to the Suffolk County district attorney's office, swore out the affidavit in support of the May 10 warrant. The affidavit filed with the return indicates that Officer O'Malley participated in the interception process.

suppression of intercepted communications as long as a defendant's constitutional rights are not prejudiced.[28] See, e.g., *United States* v. *Chavez,* 416 U. S. 562 (1974) (failure to report correctly the identity of the person authorizing the application does not warrant suppression of evidence); *United States* v. *Poeta,* 455 F. 2d 117, 120-121 (2d Cir. 1972), cert. den. 406 U. S. 948 (1972) (fact that provision of order stating that interception need not automatically terminate had been inadvertently struck did not render inadmissible statements intercepted subsequent to first inculpatory communication);[29] *United States* v. *Tortorello,* 489 F. 2d 764, 780 (2d Cir. 1973), cert. den. 414 U. S. 866 (1973) (a pragmatic approach is to be taken with respect to particularity requirement and the papers as a whole, order and application, must be considered together). Cf. *Moore* v. *United States,* 461 F. 2d 1236 (D. C. Cir. 1972); *United States* v. *Bynum,* 475 F. 2d 832 (2d Cir. 1973); *United States* v. *Cirillo,* 499 F. 2d 872 (2d Cir. 1974), cert. den. 419 U. S. 1056 (1974).

*State* v. *Christy,* 112 N. J. Super. 48, 74-76 (1970), concerned an omission virtually identical to that at issue here in that the warrant issued did not expressly define the duration and, in addition, did not set forth any dates. The judge reasoned that, "[t]he order should not be read

---

[28] *United States* v. *Lamonge,* 458 F. 2d 197 (6th Cir. 1972), cert. den. 409 U. S. 863 (1972), the only case cited by the defendants in support of their position, does not compel a contrary result. In that case the absence of a date in the wiretap order made its duration unlimited by its own terms; the prosecuting attorney moved to add the *date of issuance* nunc pro tunc. Besides the fact that the warrant lacked an issuance date, not true of the warrant at issue here, there was no indication in the *Lamonge* case that the application did provide particulars which would properly delimit the order.

[29] We point out that the facts in these cases are substantially stronger than in the *Poeta* case, for in that case the court was required to infer that the nontermination provision had been inadvertently deleted, while here there was a direct statement and finding to that effect.

*in vacuo* but against the backdrop of the application," and concluded that since the application expressly sought permission to wiretap for thirty days, the warrant was subject to proper limitations. We apply a similar analysis.

The application submitted by the assistant district attorney specifically requested authorization to intercept "for a period of 15 calendar days, commencing on the date of installation," the supporting affidavit was sworn to by an officer involved in executing the warrant and the trial judge found that the omission was the result of error and inadvertence. In light of these combined factors we think that the May 10 warrant and the application could be read together and that so read the warrant was properly limited in its duration.

It is clear, of course, that a termination date, establishing finally the duration of the interception, is necessary to prevent "the equivalent of a series of intrusions, searches, and seizures pursuant to a single showing of probable cause." *Berger* v. *New York,* 388 U. S. 41, 59 (1967). However, we are of the view that, in the circumstances of these cases, that protection was fully assured.

(2) Return, Sealing, and Notice.

The next assignments of error argued by the defendants relate to the return made on the April 24, 1972, warrant both with respect to timeliness and substance, and further relate to the manner of sealing of the tapes on the return. In addition, the defendants claim that they were not given proper notice of the warrants by service thereof and that the bases for postponement of service were imprecisely stated.

Section 99 M provides that, within seven days after termination of the interception, a return must be made to the issuing judge. The return on the April 24 wiretap warrant indicates that interceptions commenced on April 25. Interpreting § 99 I 2 as authorizing only fifteen days of interception, as the Commonwealth does, the inter-

ception would have ended on May 9, and hence the return should have been filed on May 16, 1972. It was not filed until May 18, 1972, two days late. The defendants submit that the intercepted communications should be suppressed because in their view the return, filed two days late, failed to meet the strictures of § 99 M.

We think that total suppression is an extreme remedy and we do not think the statutes require it where, as here, the return was made two days beyond the period prescribed in the State statute.[30] We base this conclusion on two grounds. First, as we stated in *Commonwealth* v. *Cromer*, 365 Mass. 519, 521, fn. 3 (1974), and cases cited therein, "The 'overwhelming weight of authority,' however, is to the effect that required warrant return procedures are ministerial, and failure to comply therewith is not ground for voiding an otherwise valid search." That these warrants authorize the seizure of communications, rather than goods, does not mean that existing practice with regard to the return is inapplicable, and an analysis similar to that employed generally for search warrants seems justified. Indeed, several Federal courts have reached this conclusion with respect to wiretap warrants. In light of the ministerial nature of the return these courts have reasoned that certain deficiencies in the return and filing of inventories need not, absent a showing of prejudice by the defendant, render inadmissible the evidence seized through wiretap surveillance. See, e.g., *United States* v. *Smith*, 463 F. 2d 710, 711 (10th Cir. 1972); *United States* v. *Wolk*, 466 F. 2d 1143 (8th Cir. 1972); *United States* v. *Cafero*, 473 F. 2d 489, 499 (3d Cir. 1973), cert. den. 417 U. S. 918 (1974);

---

[30] There is no doubt that the return was made two days beyond the prescribed period in the State statute and the defendants challenged this error as matter of State law; no claim is made that the return failed to meet Federal requirements and we need not reach the issue except to say that the crucial question would be whether the return was made within a reasonable time.

*United States* v. *Lawson,* 334 F. Supp. 612, 616 (E. D. Pa. 1971).

The defendants have made no claim that they were in any way prejudiced by the delay in the return. *Commonwealth* v. *Cromer,* 365 Mass. 519, 521, fn. 3 (1974), and cases cited. Nor have they alleged that in their cases a return nine days following termination did fail "to satisfy any of those statutory requirements that directly and substantially implement the congressional intention to limit the use of intercept procedures to those situations clearly calling for the employment of this extraordinary investigative device." *United States* v. *Giordano,* 416 U. S. 505, 527 (1974).

For these reasons we hold that the late filing of the return in these cases did not render inadmissible all evidence seized through the surveillance.

In reference to their claim that the return failed to meet the requirements of § 99 M in that the necessary "statement of the premises or places where the interceptions were made" is not satisfied by the phrase "premises close by to the aforementioned 102 Cass Street," we point out that testimony was offered at the preliminary hearing on the motions to suppress that the exact location was omitted in order to protect the identity and safety of the Commonwealth's informer. The defendants did not attempt to show any need for this material in order to prepare their defense. Cf. *Commonwealth* v. *Johnson,* 366 Mass. 534 (1974).

The defendants further contend that the first warrant, that of April 24, was deficient in that postponement of service of a copy of a warrant is stated as resting on a finding of "exigent circumstances" as opposed to "important special facts," the statutory phrase. § 99 L 2. We take note that the warrant states "circumstances of exigency do exist, and the same exigency permits and requires postponement of service of a copy of the within warrant until after the expiration of this and related investigations, but not later than three (3) years there-

after." Moreover, § 99 L 2 requires "a showing [in the application] of important special facts which set forth the need for continued secrecy" (emphasis supplied), and it is not clear that the warrant itself, rather than the application, must repeat this language verbatim. The important point with respect to the warrant is that the issuing judge review and decide whether such "important special facts" exist warranting postponement of service. In these cases we are of opinion that the judge did make such a determination, after reviewing the nature of the criminal activity under investigation.[31]

Finally, the defendants claim that the recordings were improperly sealed. There is some lack of clarity as to whether the tapes were first brought to the Chief Justice of the Superior Court or to the issuing judge, although there were statements made by the assistant district attorney that the tapes were sealed by the investigative officers. Admittedly this procedure does not comply exactly with the statutory provisions. However, the issuing judge could have, if he deemed it necessary, broken the seal which consisted of masking tape, examined the tapes and resealed the containers holding the tapes. In any event, we agree with the reasoning of the court in *United States* v. *Poeta,* 455 F. 2d 117 (2d Cir. 1972), cert. den. 406 U. S. 948 (1972), that sealing is a ministerial function; that the purpose of sealing is to insure the privacy and integrity of the tapes, which was accomplished here, and that absent an affirmative showing of prejudice, exclusion of all evidence may not in all cases be mandated. See *United States* v. *Falcone,* 508 F. 2d 478 (3d Cir. 1974). We note that the defendants have not shown any prejudice in this regard and we think that total exclusion of all evidence obtained is a

---

[31] We fail to see how the defendants were prejudiced by service of unattested copies of the warrants on their defense counsels. And we note that § 99 O allows for such service before evidence obtained through any interception may be introduced in a criminal trial.

remedy far beyond the nature of the infraction, if, as we discussed, one existed here at all.

(3) Pen Registers.

The defendants' final claim with respect to execution of the wiretap warrants is that the Commonwealth exceeded the scope of the warrants in utilizing pen registers (a pen register is a mechanical device which records on tape the numbers dialed from a given line; the device does not identify the telephone number from which incoming calls originated).

Although there is some controversy, the majority of courts have concluded that the provisions of Title III do not govern the installation of a pen register to monitor and record the numbers dialed from a particular telephone line since the device does not, as defined in § 2510 (4), intercept "the *aural* acquisition of the *contents* of any wire or oral communication" (emphasis supplied).[32] *United States* v. *Giordano*, 416 U. S. 505, 553 (1974) (Powell, J., concurring and dissenting). *United States* v. *Brick*, 502 F. 2d 219 (8th Cir. 1974). *United States* v. *Falcone*, *supra*. *United States* v. *Escandar*, 319 F. Supp. 295 (S. D. Fla. 1970), reversed and remanded on other grounds sub nom. *United States* v. *Robinson*, 468 F. 2d 189 (5th Cir. 1972), further remanded 472 F. 2d 973 (5th Cir. 1973). *United States* v. *King*, 335 F. Supp. 523 (S. D. Cal. 1971), revd. on other grounds, 478 F. 2d 494 (9th Cir. 1973), cert. den. sub nom. *Light* v. *United States*, 414 U. S. 846 (1973). *United States* v. *Vega*, 52 F. R. D. 503 (E. D. N. Y. 1971). Contra, *United States* v. *Lanza*, 341 F. Supp. 405 (M. D. Fla. 1972); *In re Alperen*, 355 F. Supp. 372 (D. Mass. 1973). We reached the same conclusion in

---

[32] The Senate Report on § 2510 (4), at p. 2178, states that "intercept" is "to include the aural acquisition of the contents of any wire or oral communications by any electronic, mechanical, or other device. Other forms of surveillance are not within the proposed legislation. . . . The use of a 'pen register,' for example, would be permissible."

*Commonwealth* v. *Coviello,* 362 Mass. 722 (1973), although we held in that case that disclosure of the results of the operation of a pen register where no warrant had been obtained was in violation of 47 U. S. C. § 605 (1970), the Federal Communications Act of 1934, as amended by the Omnibus Crime Control and Safe Streets Act of 1968.

The question presented here is whether a separate order authorizing the use of a pen register is required where a valid order authorizing a simultaneous wiretap interception has been issued pursuant to the applicable Federal and State statutes.[33] We hold that a separate order authorizing use of a pen register is not required where there is a valid wiretap warrant outstanding, and that use of the device was permissible in these cases as within the directive of the warrants authorizing the use of "necessary and proper systems to [i]ntercept . . . [the] communications transmitted." See *United States* v. *Brick,* 502 F. 2d 219 (8th Cir. 1974); *United States* v. *Falcone,* 505 F. 2d 478 (3d Cir. 1974).

KAPLAN, J. (dissenting). I refer to my separate opinion in *Commonwealth* v. *Lykus, ante,* 191 (1975). In the present cases, a ruling that it was error to receive the evidence based on the voice spectrograms would appear to entail reversal of the judgments.

---

[33] Of course, utilization of the pen register depends on compliance with the probable cause requirements of the Fourth Amendment.