Connolly, J.
Defendant, Dario Valdez (“Valdez”), has been charged with trafficking in cocaine in violation of G.L.c. 94C, §32E(b)(3) and conspiracy to traffic in cocaine in violation of G.L.c. 94C, §40. Defendant has now moved this Court to suppress any evidence derived from intercepted wire and oral communications. As grounds thereof, defendant argues that his communications were intercepted in violation of G.L.c. 272, §99 [the Massachusetts Wiretap Statute] and Article 14 of the Massachusetts Declaration of Flights.
For the following reasons, defendant’s motion to suppress is DENIED.
FINDINGS OF FACT
In the month of April 1998, Special Agents from the Drug Enforcement Administration (the “DEA”) began conducting an investigation involving the defendant. The investigation was handled by a special unit at the DEA referred to as Task Force 9 (the “Task Force”). The Task Force was supervised by Agent Michael Cunniff (“Agent Cunniff’). The case agent on the Task Force was Agent Calvin Kantor (“Agent Kantor”).[1]
On April 15, 1998, the DEA Task Force set up a controlled drug buy between DEA informant, Walter Colon (“Colon”), and Valdez in Boston, Massachusetts. At this controlled buy Colon purchased 125 grams of cocaine from Valdez.[2] Thereafter, another controlled buy between Valdez and Colon was arranged for April 24, 1998, however, this controlled buy did not come to realization.
At approximately 2:00 in the afternoon of April 28, 1998, Agent Kantor and Agent Edgar Sarabia (“Agent Sarabia”) met with Colon at the DEA New England Field Office, Boston, Massachusetts. Colon, through the instruction of the Agents, called Valdez via telephone. Thereafter, Colon negotiated to purchase 125 grams of cocaine from Valdez. Valdez and Colon agreed to meet at McDonald’s Restaurant (“McDonald’s”), located at 463 Massachusetts Avenue, Cambridge, Massachusetts,[3] in order to execute the drug transaction. The telephone conversation between Valdez and Colon was monitored and recorded by the Task Force.
At approximately 2:30 that afternoon, in accordance with its normal practice and procedures, the DEA Task Force contacted the Cambridge Police Department and advised them of the impending drug transaction. Thereafter, the Cambridge Police Department assisted the Task Force in setting up surveillance in and around McDonald’s.
With Colon’s consent, the DEA supplied Colon with a recorder and transmitting device and concealed it under his clothing. Valdez arrived at McDonald’s in a white Toyota Camry at approximately 3:45 p.m. that afternoon. Colon drove to McDonald’s and met Valdez inside of the establishment. While inside McDonald’s, Colon and Valdez engaged in a conversation pertaining to the drug sale. This conversation was recorded by the Task Force utilizing the recorder and transmitting device Colon concealed on his person.
Juan Luciano (“Luciano”) was outside of McDonald’s. Colon pointed to Luciano and instructed the agents and police officers to grab him. When Detectives Grey, DeMarco and Agent Sarabia proceeded to approach McDonald’s, Luciano fled on foot. •Thereafter, the officers, who were also on foot, followed Luciano.[4] The officers saw Luciano walking quickly *163 into an alley at the rear of 54 Bishop Allen Drive. They then witnessed Luciano crouching near a trash dumpster which was adjacent to a fence; Luciano appeared to be rummaging around on the ground.
Agent Sarabia identified himself as a police officer and instructed Luciano to “stop.” Subsequently, Luciano jumped over a fence, which was located next to the trash dumpster, and ran toward Bishop Allen Drive. The foot chase continued as Officer DeMarco radioed a description of Luciano to patrol units. Luciano then ran into the Harvest Cooperative parking lot located on Essex Street. Officers Grey and DeMarco were still on foot pursuit of Luciano and patrol units were arriving on the scene with their lights and sirens blaring. At this point Luciano discarded his blue and white jacket. The officers caught up to Luciano and placed him under arrest in the parking lot. Valdez was arrested outside of McDonald’s.
One beeper, $190.00 in United States currency, and one blue and white jacket were seized from Luciano. Additionally, officers found 125 grams of cocaine underneath some newspapers in the area where Luciano was earlier observed crouching. Thereafter, Valdez was brought to the Cambridge Police station where he was fingerprinted and booked. The case was ultimately transferred to the Cambridge Police Department for prosecution.
RULINGS OF LAW
Defendant asserts that the evidence derived from the wiretaps should be suppressed because such evidence was obtained in violation of G.L.c. 272, §99, the Massachusetts Wiretap Statute, and Article 14 of the Massachusetts Declaration of Rights. Defendant asserts that G.L.c. §99 and the Massachusetts Declaration of Rights are applicable to the case at bar because the undercover investigation of defendant was a combined state and federal enterprise that was state-oriented.
I. The Wiretap Statute (G.L.c. 272, §99]
Defendant claims that the evidence derived from the electronically intercepted wire and oral communications should be suppressed because it was obtained in violation of G.L.c. 272, §99. The Wiretap Statute allows defendants in criminal cases to move to suppress the contents of any electronically intercepted wire or oral communication or any evidence derived therefrom if the communication was “unlawfully intercepted” or “not intercepted in accordance with the terms of this section.” G.L.c. 272, §99P(1)(2).
Specifically, defendant argues that the officers did not conform with the requirements set forth in the Wiretap Statute because they failed to abide by G.L.c. 272, §§99F through 99M which pertains to the warrant requirements. Additionally, defendant argues that the facts surrounding these interceptions did not fall under any of the exceptions enumerated in G.L.c. 272, §99B4. Pursuant to §99B4, “it shall not constitute an interception for an investigative or law enforcement officer ... to record or transmit a wire or oral communication if the officer is a party to such communication or has . . . prior authorization to record or transmit the communication by such a party and if recorded or transmitted in the course of any investigation of a designated offense[5] as defined herein.” G.L.c. 272, §99B4.
However, federal officials acting pursuant to authority of the laws of the United States are not subject to the requirements of the Wiretap Statute. “It shall not be a violation of [G.L.c. 272, §99] for investigative and law enforcement officers of the United States to violate the provisions of [§99] if acting pursuant to authority of the laws of the United States and within the scope of their authority.” G.L.c. 272, §99Dlc. “The federal officer exemption contained in 99Dlc allows federal officials to conduct their own investigation in accordance with federal law, free of the statute’s criminal and civil penalties.” Commonwealth v. Jarabek, 384 Mass. 293, 297 (1981); Commonwealth v. Gonzalez, 426 Mass. 313 (1997).
However, the federal officer exemption contained in G.L.c. 277, §99D 1c does not render the federal interceptions automatically admissible. In Jarabek, the court held that, despite a heavy federal presence, an investigation was state-oriented because it was “the fruit of a combined enterprise between state and federal officials. In such a combined operation, if the state regulatory scheme imposes a stricter standard, it is by that standard that the validity of official conduct is to be judged for purposes of a motion to suppress under c. 272, §99P.” Jarabek, 384 Mass. at 297, citing Commonwealth v. Vitello, 367 Mass. 224, 247 (1975).
Defendant argues that in the case at bar, G.L.c. 272, §99 is applicable because the facts reveal that the federal officers were agents of the local police and the investigation was state-oriented. Defendant argues that this was a combined state and federal enterprise because the case was intended to be prosecuted by the state; the Cambridge police were called in when the actual arrest was going to transpire at McDonald’s; defendant was booked and fingerprinted by the Cambridge Police Department; and the Cambridge police and Middlesex County District Attorney’s office prosecuted the case.
Defendant is mistaken in his assertion that the undercover operation and ultimate arrest of defendant was state-oriented. The facts show that the entire operation, from beginning to end, was a federal operation. The court in Jarabek found the investigation in that case state-oriented because it was initiated by the state; funds for the investigation were supplied by the state; the state authorities retained veto power over the making of the recordings and participated in recording expeditions; and, the recorded conversation resulted in state prosecutions. Jarabek, 384 Mass. at 297. However, these facts are entirely different from the case at bar.
In the case at bar, the investigation was initiated by DEA agents and Valdez was a target of federal officials. *164 Colon, the informant used in the investigation, was a federal informant and federal funds were used to compensate him. The equipment used to intercept and record the oral and wire communications, including other surveillance equipment, were owned by the DEA. The money used to purchase the cocaine in the controlled buys was supplied by the DEA.
The conduct of the investigation was directed by federal Special Agents with Agent Cunniff as the supervisor of the operation. Agent Kantor was the case agent who reported to Agent Cunniff. Although Agent Kantor is a Cambridge police officer, for two and one-half years prior to defendant’s arrest, Agent Kan-tor had been assigned to the DEA.[6] Additionally, the Cambridge Police Department received federal funding for Agent Kantor’s participation in the Task Force.
The Cambridge Police Department was contacted during the impending controlled drug transaction solely as a matter of normal procedure. The local police were present to assist the DEA and their presence was subordinate to and at the discretion and direction of the DEA Agents.
Finally, the decision to prosecute in federal or state court was made by federal officials. Nothing prevented the federal officials from referring the case to the Cambridge police for prosecution. It is entirely possible that the lesser amount of cocaine seized was the determining factor as to why the case went to federal as opposed to state court. See Gonzalez, 426 Mass. at 316 (the decision to prosecute in state court was a last-minute exercise of prosecutorial discretion). Additionally, there is nothing indicating that the federal government engaged in collusive behavior in order to bypass the stricter state standards.
This case is strikingly similar to the Gonzalez case. In Gonzalez, the court held that there was not a state-oriented investigation because the investigation was initiated by federal agents; the federal agents made the decision to record the conversations; the purpose of the investigation was to obtain evidence for a federal prosecution. Gonzalez, 426 Mass. at 316. The court held this way even though the state police department assisted the DEA with the investigation providing surveillance, intelligence information and facilities to field test the cocaine. Gonzalez, 426 Mass. at 314.
Accordingly, the recordings between Valdez and Colon was obtained solely by federal agents exercising federal authority in conformity with federal standards and consistent with federal procedures. Therefore, because there was no combined enterprise and the investigation was purely federal, the requirements of G.L.c. 272, §99 are not applicable.
II. Article 14 of the Massachusetts Declaration of Rights
Defendant next argues that the recordings of the telephone conversations between Valdez and Colon on April 28, 1998, should be suppressed, including any testimony given by a witness who relies on such a recording, because such recordings violated Article 14 of the Massachusetts Declaration of Rights. Defendant contends that it had a reasonable expectation of privacy in his telephone conversations. Defendant asserts that Article 14 is applicable to the case at bar because the undercover operation was a combined state-federal enterprise that was state-oriented. However, as discussed earlier, the investigation was purely federal and, therefore, Article 14 is not applicable.
Article 14 of the Massachusetts Declaration of Rights has been read in certain circumstances as providing greater protection than the Fourth Amendment to the federal Constitution. Cooper v. California, 386 U.S. 58 (1967) (states have the power to impose higher standards than required by the federal constitution); Commonwealth v. Upton, 394 Mass. 363, 371-373 (1985) (Article 14 of the Declaration of Rights does, or may afford more substantive protection to individuals than that which prevails under the Constitution of the United States).
However, a state Constitution only governs the conduct of the State’s own agents or others acting under color of state law, not federal agents. Federal officers acting lawfully and in conformity to federal authority are unconstrained by the state Constitution, and may turn over to state law enforcement officers incriminating evidence, the seizure of which would have violated state constitutional standards. Gonzalez, 426 Mass. at 317.
This Court finds that the undercover operation was strictly federal. Additionally, the evidence obtained utilizing the wiretaps was not obtained through misconduct of federal or state officials of any kind. Federal officials lawfully recorded the communications pursuant to the Fourth Amendment to the Constitution of the United States and federal law.
ORDER
For the foregoing reasons, the defendant’s motion to suppress is hereby DENIED.

 Agent Kantor is a Cambridge Police Officer who, at the time, was assigned to the DEA. Agent Kantor has been sworn and deputized as a federal agent. The Cambridge Police Department received federal funding for Agent Kantor’s participation in the Task Force. The DEA recruits local police officers as agents in order to give new agents the opportunity of working with “street-wise” law enforcement officers.

The money used to purchase the cocaine was supplied by the DEA. Additionally, all surveillance equipment was the property of the DEA.

This area is known as Central Square.

The officers were not chasing Luciano at this point.

The “designated offense” is limited to offenses in connection with organized crime. G.L.c. 272, §99B7. The preamble states that
organized crime . . . consists of a continuing conspiracy among highly organized and disciplined groups to engage in supplying illegal goods and services.
G.L.c. 272, §99A.

The DEA recruits local police officers as agents in order to give new agents the opportunity of working with “streetwise” law enforcement officers.